UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DANIEL KISS,

                            Plaintiff,

        v.

RAFAEL A. TORRES, *et al.*,

                            Defendants.

No. 21-CV-10391 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances</u>:

Daniel Kiss
Poughkeepsie, NY
*Pro Se Plaintiff*

Amanda Yoon, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendant James Schulhoff*

Drew W. Sumner, Esq.
Sumner Law LLP
White Plains, NY
*Counsel for Defendants Rafael Torres, Town of Hyde Park, Daniel Ferrara, Michael Stallone, Joshua Tucker*

James A. Randazzo, Esq.
Portale Randazzo LLP
White Plains, NY
*Counsel for Defendants Rafael Torres, Town of Hyde Park, Daniel Ferrara, Michael Stallone, Joshua Tucker*

KENNETH M. KARAS, United States District Judge:

Daniel Kiss ("Plaintiff"), proceeding pro se, brings this case against Hyde Park Police

Officers Rafael Torres ("Torres"), Daniel Ferrara ("Ferrara"), Michael Stallone ("Stallone");

New York State Trooper James Schulhoff ("Schulhoff," collectively "Officer Defendants"); and

the Town of Hyde Park ("Hyde Park," and with the Officer Defendants, the "Defendants"). (*See* Compl. (Dkt. No. 11).)  Plaintiff raises claims pursuant to 42 U.S.C. § 1983 ("§ 1983"), alleging violations of the Fourth and Fourteenth Amendments, and also, construing his pleadings liberally, brings a number of claims under New York law, including unlawful detainer, unlawful eviction, conversion, false arrest, unlawful seizure of Plaintiff's person and property, and negligence. (*See* Compl. 1; Pl's Opp'n to Hyde Park Defs' Mot. to Dismiss ("Pl's Hyde Park Opp'n") 25 (Dkt. No. 28).)[1]  Before the Court are Defendants' Motions To Dismiss. (*See* Not. of Mot. (Dkt. No. 18); Not. of Mot. (Dkt. No. 20).)  For the reasons that follow, Defendants' Motions are granted.

## I.  Background

### A.  Factual Background

Unless otherwise stated, the following facts are drawn from the Complaint and Plaintiff's Opposition briefs. (*See generally* Compl.; Pl's Hyde Park Opp'n; Pl's Opp'n to Schulhoff's Mot. to Dismiss ("Pl's Schulhoff Opp'n") (Dkt. No. 29).)  The facts alleged are assumed true for the purpose of resolving the instant Motions. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

---

[1] When reviewing a complaint submitted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a defendant's] request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2010 WL 5186839, at *2 (E.D.N.Y. Sept. 19, 2013), "documents either in [the plaintiff's] possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted), and "[plaintiff's] opposition memorandum," *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997).

The Court cites to the ECF-stamped page number at the upper right-hand corner of all documents unless otherwise noted.

In June 2019, Sharon Kenny ("Sharon"), Plaintiff's "close friend and ex-fianc[é]e," invited Plaintiff and his wife, Danny Villa Rodriguez, to live with her at her home located at 4 Potter Bend, Poughkeepsie, New York (the "Residence").  (Compl. ¶¶ 1, 10.)[2]  Sharon had recently gone through a divorce and wanted Plaintiff and his wife to "move in with her for company."  (*Id.* at ¶ 10.)  Plaintiff and his wife agreed to move into the Residence with Sharon, and they "moved completely out of [Plaintiff's] Hackensack residence and did not maintain a separate dwelling."  (Pl's Hyde Park Opp'n 3.)  Plaintiff planned for a "long, indefinite stay" and moved a large number of personal belongings into the Residence.  (*Id.*)

Once Plaintiff and his wife moved in, they did not pay rent, but Plaintiff did make improvements to the Residence, including "constructing a shed in the back yard, repairing or replacing fixtures and furnishings, painting the back deck and different areas in the house, all with his own money."  (*Id.*; Compl. ¶ 11.)  Plaintiff and his wife also "contributed regularly and meaningfully to the living expenses and maintenance expenses at the Residence, including [by], landscaping, repairing appliances and equipment, cleaning the Residence and shopping for groceries, [also] using [their] own money."  (Pl's Hyde Park Opp'n 3–4.)  Finally, Plaintiff and his wife assisted Sharon with caring for Sharon's elderly father, Jules Kenny ("Jules"), who also lived at the Residence and was in hospice.  (*Id.* at 4; Compl. ¶ 12.)

On December 17, 2019, Sharon died unexpectedly in a skiing accident.  (Compl. ¶ 13.)  Over the next month and a half, Plaintiff and his wife continued to live with Jules at the Residence, and members of Sharon's family, including Sharon's sister Janet Kenny ("Janet"), came to visit the Residence on approximately five occasions.  (*Id.* at ¶¶ 13, 14.)  During one of

---

[2] Plaintiff also identifies the Residence as being located in Hyde Park, New York.  (Pl's Hyde Park Opp'n 2.)

those visits, Janet and other family members "removed various items" and "told Plaintiff that they'd taken everything that mattered to them."  (Pl's Hyde Park Opp'n 4.)

During some of the visits, Janet, who was the executor of Sharon's will, explicitly forbade Plaintiff from moving out of the Residence.  (Compl. ¶ 14.)³  However, she also communicated to Plaintiff that he "would have to move eventually, but . . . not before the probate process was finished, which was estimated to be by March 2020."  (Pl's Hyde Park Opp'n 4.) Janet told Plaintiff to call the police if he observed Sharon's ex-husband near the Residence and asked that he install surveillance cameras, which Plaintiff did.  (*Id.* at 4–5.)  At some point, Janet also "called Plaintiff's wife and stated that she would call the police if Plaintiff and his wife attempted to move out of the home with their belongings because Janet did not know which items belonged to the estate and which belonged to Plaintiff and his wife."  (*Id.* at 5.)

On January 29, 2020, the Kenny family moved Jules from the Residence to a nursing home, where Plaintiff and his wife continued to visit and care for him.  (Compl. ¶ 16.)  The same day, Janet called Plaintiff and again instructed him to stay in the Residence and to not remove any belongings, including his personal belongings, until probate proceedings ended in March 2020.  (*Id.* at ¶ 17.)  At some point, she also "asked Plaintiff to stay in the Residence for maintenance and security reasons [and] told Plaintiff that the insurance company preferred that

---

³ Plaintiff alleges that "almost immediately after Sharon's death[,] [Janet] began falsely asserting that she was the administrator of Sharon's estate despite not petitioning Surrogate's Court for any type of appointment until after February 13, 2020."  (Pl's Hyde Park Opp'n 4.) However, Plaintiff also appears to concede that Janet has since been appointed the executor of Sharon's estate.  (Pl's Hyde Park Opp'n 13 ("[I]n fact, she had not received her appointment *yet* from the Surrogate.") (emphasis added).)

the Residence remained occupied." (Pl's Hyde Park Opp'n 5.)[4]  Jules died a few weeks later on the morning of February 13, 2020.  (*Id.* at ¶ 18.)

During the afternoon of February 13, Janet observed Plaintiff and his wife bringing groceries into the Residence through the surveillance system, (Pl's Hyde Park Opp'n 6), and she contacted the Hyde Park Police Department and the New York State Police, (Compl. ¶ 19; Pl's Hyde Park Opp'n 13).  Specifically, Janet told the police:

> [Plaintiff and his wife] were engaged in "suspicious activity," that they were removing items from the home when they had been expressly told to not remove items without her being present, and that she was the executor of the estate. . . . Janet did not describe any items that Plaintiff and his wife were removing [and] did not actually state they were stealing or trespassing (only that they were removing items from the home without her present).

(Pl's Hyde Park Opp'n 6.)[5]  Plaintiff alleges that "Janet . . . had no basis on which to make this claim, as Plaintiff had not removed any of the Kenny family's belongings from the house, and was continuing to live in the house in accordance with [Janet's] previously expressed wishes." (Compl. ¶ 19.)

---

[4] Plaintiff also alleges that "Janet wanted Plaintiff around to show her how various items in the house worked because Janet didn't know how they worked."  (Pl's Hyde Park Opp'n 5.)

[5] In the Complaint, Plaintiff does allege that Janet reported that Plaintiff and his wife "were actively trespassing and were stealing belongings from the [Residence]."  (Compl. ¶ 19.) Plaintiff has requested that the Court read these allegations in the alternative because "in the absence of full discovery Plaintiff is left to infer the potential content of Janet's call to the police from the limited responses to his FOIA requests, his interactions with Janet and other members of the family following the eviction, his interactions with currently named defendants during the eviction, and his encounters with the police following the eviction."  (Pl's Hyde Park Opp'n 6 n.3.)  The Court construes this as a request by Plaintiff to consider his claims under whichever version of the facts is most favorable.

The Officer Defendants arrived at the Residence unannounced.  (*Id.* at ¶ 20.)[6]  Plaintiff heard some noises outside and stepped out on the back deck, where he saw several of the Officer Defendants.  (Pl's Hyde Park Opp'n 7.)  One of the Officer Defendants asked Plaintiff "What's going on here[?]" and Plaintiff responded that nothing was going on and reentered the Residence.  (*Id.*)  The Officer Defendants followed Plaintiff into the Residence and then directed Plaintiff and his wife to "stay in the living room."  (Compl. ¶ 20.)  Plaintiff told the Officer Defendants that he lived at the Residence and that most of the items in the Residence were his belongings.  (*Id.*)  Plaintiff alleges that the Officer Defendants "made no attempt to listen to or verify Plaintiff's statements" and "forced Plaintiff and his wife to remain in the living room under supervision while [some of the Officer Defendants] searched the [Residence]."  (*Id.* at ¶ 21.)  The Officer Defendants called Janet multiple times during this period and "Janet [was] [never] able to identify a specific item that she alleged [Plaintiff and his wife] to have been taking."  (Pl's Hyde Park Opp'n 7.)  During one of the calls, Janet told the Officer Defendants that she had "observed Plaintiff removing items from the shed that day."  (*Id.*)  However, Plaintiff alleges that the Officer Defendants determined that this statement was not true by looking "out the window to the shed[,]" where "there was a great deal of snow on the ground from a [recent] snow storm . . . but no tracks to the shed."  (*Id.* at 8.)  During another call, Janet confirmed that she had requested that Plaintiff should leave a key for her to pick up the next day and that Plaintiff "had keys to the Residence."  (*Id.*)

---

[6] Throughout his pleadings, Plaintiff does not identify any of the Officer Defendants by name.  In a few instances, he does refer to a "trooper," which could be construed as a reference to Schulhoff.  (Pl's Hyde Park Opp'n 8, 9.)  However, it is unclear whether Plaintiff is actually referring to Schulhoff or using the term as an alternative to "officer," so the Court will not assume that references to a "trooper" are, in fact, references to Schulhoff.

The Officer Defendants also searched Plaintiff's van and his wife's car.  (Compl. ¶ 22; Pl's Hyde Park Opp'n 8.)  During the search of his wife's car, one of the Officer Defendants found a laptop and called Janet to inquire about it.  (Pl's Hyde Park Opp'n 8.)  Janet informed the Officer Defendant that the computer did not belong to Sharon's estate.  (*Id.*)

Plaintiff alleges that the Officer Defendants found no evidence of trespassing, stolen property, or other illegal acts from the searches.  (Compl. ¶ 23.)  The Officer Defendants then told Plaintiff that he and his wife were being removed from the Residence and that they must hand over their keys to the Residence.  (*Id.* at ¶ 24.)  The Officer Defendants also forbade Plaintiff and his wife from taking any items with them because the Officer Defendants "didn't know what items belonged to who."  (*Id.*; Pl's Hyde Park Opp'n 9.)  The Officer Defendants then seized Plaintiff and his wife's keys to the Residence.  (Compl. ¶ 25; Pl's Hyde Park Opp'n 9.)

Before Plaintiff and his wife left, the Officer Defendants noticed that Plaintiff had several power tools in his van.  (*Id.* at ¶ 26.)[7]  The Officer Defendants then called Janet, and she told them "she couldn't know if any of the power tools belonged to the estate without seeing them," so the Officer Defendants "forced Plaintiff to unload the power tools, carry them to the garage and leave them there."  (Pl's Hyde Park Opp'n 10.)

The Officer Defendants informed Plaintiff and his wife that the Residence would be under police surveillance and that they would be arrested if they attempted to return and collect any property.  (*Id.* at ¶ 27.)  Plaintiff and his wife then left the Residence.  (*Id.* at ¶ 28.)

---

[7] Plaintiff explains that his "van was clearly a construction van [and] basically a giant toolbox . . . [that] contained power tools, . . . screws, nails, hammers, screwdrivers, construction materials, tape, a balance, and various other inexpensive construction items."  (Pl's Hyde Park Opp'n 10.)

At a later time, Janet confirmed that nothing had been stolen from the Residence and declined to press charges.  (*Id.* at ¶ 30.)  As of November 14, 2022, Plaintiff had not recovered his property from the Residence.  (Pl's Hyde Park Opp'n 2, 25.)[8]

B.  Procedural History

Defendants removed this Action from New York Supreme Court, Dutchess County on December 6, 2021.  (*See* Not. of Removal (Dkt. No. 1).)  On June 14, 2022, the Court held a conference and directed Plaintiff to file his Complaint by June 17, 2022.  (*See* Dkt. (minute entry for June 14, 2022).)  After requesting an extension (*see* Dkt. No. 10), Plaintiff filed his Complaint on June 23, 2022, (*see* Compl.).  On July 1, 2022, the Hyde Park Defendants submitted a letter requesting leave to file a Motion To Dismiss.  (*See* Letter from James A. Randazzo, Esq. to Court (July 1, 2022) (Dkt. No. 14).)  The Court issued an order setting a briefing schedule on July 13, 2022.  (*See* Order (Dkt. No. 15).)  The same day, Schulhoff submitted a letter to the Court requesting leave to file a Motion To Dismiss.  (*See* Letter from Amanda Yoon, Esq. to Court (July 13, 2022) (Dkt. No. 16).)  The Court issued an order setting a briefing schedule for Schulhoff's Motion on July 17, 2022.  (*See* Order (Dkt. No. 17).)  On August 12, 2022, Schulhoff filed his Motion To Dismiss and accompanying papers.  (*See* Not. of Mot.; Mem. of Law in Supp. of Mot. To. Dismiss ("Schulhoff Mem.") (Dkt. No. 19).)  On August 15, 2022, the Hyde Park Defendants filed their Motion To Dismiss and accompanying papers.  (*See* Not. of Mot.; Mem. of Law in Supp. of Mot. To Dismiss ("Hyde Park Defs' Mem.") (Dkt. No. 21); Decl. of James A. Randazzo (Dkt. No. 22).)  After a request for an

---

[8] Plaintiff alleges that he has "made repeated attempts to get his property back from Janet, and he was repeatedly ignored.  At a certain point, Janet told him if he continued to try and communicate with her, she would call the police again.  When [he] attempted to go to the police station a short time after [the incident on February 13], they simply gave him a vague direction to 'go to court.'"  (Pl's Hyde Park Opp'n 11.)

extension that the Court granted (*see* Dkt. Nos. 26–27), Plaintiff filed his responses on

November 15, 2022.  (Pl's Hyde Park Opp'n; Pl's Schulhoff Opp'n.)  After requests for

extensions that the Court granted (*see* Dkt. Nos. 30–33), Defendants filed their Replies.  (See

Schulhoff Reply (Dkt. No. 34); Hyde Park Defs' Reply (Dkt. 35).)

## II.  Discussion

### A.  Standard of Review

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject

matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively

identical.'"  *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2

(D. Conn. June 3, 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003),

*cert. denied*, 540 U.S. 1012 (2003)).

### 1.  Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has

authority to adjudicate the cause pressed in the complaint."  *Bryant v. Steele*, 25 F. Supp. 3d 233,

241 (E.D.N.Y. 2014) (citation and quotation marks omitted).  "Determining the existence of

subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of

subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or

constitutional power to adjudicate it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d

Cir. 2008) (citation and quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *United States v.

Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold

question").

The Second Circuit has explained that a challenge to subject-matter jurisdiction pursuant

to Rule 12(b)(1) may be facial or fact-based.  *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47,

56 (2d Cir. 2016).  When a defendant raises a facial challenge to standing based solely on the

complaint and the documents attached to it, "the plaintiff has no evidentiary burden" and a court

must determine whether the plaintiff asserting standing "alleges facts that affirmatively and

plausibly suggest that the plaintiff has standing to sue." *Id*. (alterations omitted) (quoting

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).  In making such a

determination, a court must accept as true all allegations in the complaint and draw all inferences

in the plaintiff's favor. *Id*. at 57.  However, where a Rule 12(b)(1) motion is fact-based and a

defendant proffers evidence outside the pleadings, a plaintiff must either come forward with

controverting evidence or rest on the pleadings if the evidence offered by the defendant is

immaterial. *See Katz v. Donna Karan Co., LLC*, 872 F.3d 114, 119 (2d Cir. 2017).  If the

extrinsic evidence presented by the defendant is material and controverted, the Court must make

findings of fact in aid of its decision as to standing. *See Carter*, 822 F.3d at 57.

       2.  Rule 12(b)(6)

       The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of

[its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of

the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does

a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id*.

(alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be

enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at

555.  Although "once a claim has been stated adequately, it may be supported by showing any

set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must

allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a

plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[]

complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense.  But where the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation

omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8

marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior

era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than

conclusions.").

 "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the

factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and

"draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992

F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145

(2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must

confine its consideration to facts stated on the face of the complaint, in documents appended to

the complaint or incorporated in the complaint by reference, and to matters of which judicial

notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999)

(citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317

(S.D.N.Y. 2016) (same).  However, when the complaint is from a pro se plaintiff, the Court may

consider "materials outside the complaint to the extent that they are consistent with the

allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4

n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a defendant's] request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), "documents either in [the plaintiff's] possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted), and "[plaintiff's] opposition memorandum," *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997).

Where, as here, a plaintiff proceeds pro se, the court must "construe[] [the plaintiff's] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (citation omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (citation and quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and citation omitted)).

B. Analysis

Plaintiff raises the following claims. First, Plaintiff alleges that the Officer Defendants violated his Fourteenth Amendment right to procedural due process by evicting him from the residence and depriving him of the property located in the Residence and in his van. (Compl. 7–8; Pl's Schulhoff Opp'n 12–13; Pl's Hyde Park Opp'n 19–22.) Second, Plaintiff alleges that the Officer Defendants violated his Fourth Amendment right to be free from unlawful searches by

entering and searching the Residence and his van.  (*See* Compl. 8–9; Pl's Schulhoff Opp'n 13–20; Pl's Hyde Park Opp'n 11–19.)  Third, Plaintiff asserts a *Monell* claim against Hyde Park based on the actions of Torres, Ferrara, and Stallone.  (*See* Compl. 8–9; Pl's Hyde Park Opp'n 23–24.)  Fourth, construing his pleadings liberally, Plaintiff raises a number of state claims arising from the same incidents that form the basis of his federal claims.  (*See* Pl's Schulhoff Opp'n 22–23; Pl's Hyde Park Opp'n 24–25.)

In response, the Defendants argue that Plaintiff has failed to state a claim for the eviction because he had no cognizable property interest in the Residence, (*see* Schulhoff Mem. 14–15; Hyde Park Defs' Mem. 10–11), and for the deprivation of property because New York provides adequate post-deprivation remedies, (*see* Schulhoff Mem. 10–11; Hyde Park Defs' Mem. 9). They also argue that Plaintiff cannot state a Fourth Amendment claim for the search of the residence because the Officer Defendants had probable cause to search it based on the information provided by Kenney, (*see* Schulhoff Mem. 12–13; Hyde Park Defs' Mem. 6–8), or, in the alternative, because Plaintiff, as a guest or licensee, had no reasonable expectation of privacy, (*see* Schulhoff Mem. 12–13; Hyde Park Defs' Mem. 6–8).  Defendants argue that Plaintiff cannot object on Fourth Amendment grounds to the search of his car because the Officer Defendants had probable cause to believe that there might be evidence of a crime in the car and so the automobile exception applies.  (*See* Schulhoff Mem. 13; Hyde Park Defs' Mem. 8–9.)  Hyde Park, Torres, Ferrara, and Stallone assert that Plaintiff cannot state a *Monell* claim because he does not identify a formal policy, provides no plausible allegations of a longstanding practice, and does not allege that any of Torres, Ferrara, or Stallone is a final policymaker.  (*See* Hyde Park Defs' Mem. 12.)  Defendants also assert that Plaintiff has failed to properly allege the personal involvement of any of the Officer Defendants, (*see* Schulhoff Mem. 15–16; Hyde Park

Defs' Mem. 11–12), and that the Officer Defendants are entitled to qualified immunity, (*see* Schulhoff Mem. 17–18; Hyde Park Defs' Mem. 11).  Finally, Hyde Park, Torres, Ferrara, and Stallone argue that the Court should decline Plaintiff's request to construe his pleadings to raise any state claims as they do not appear on the face of his Complaint.  (Hyde Park Defs' Reply 6.)

### 1.  Fourteenth Amendment

The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The Due Process Clause thus "bars arbitrary, wrongful government actions, and guarantees procedural fairness when a state action deprives a citizen of a protected interest in life, liberty, or property."  *Wiesner v. Rosenberger*, No. 98-CV-1512, 1998 WL 695927, at *3 (S.D.N.Y. Oct. 6, 1998) (citing *Daniels v. Williams*, 474 U.S. 327, 330–32 (1986)).  "The fundamental requirement of the Due Process Clause is that an individual be given the opportunity to be heard at 'a meaningful time and in a meaningful manner.'"  *Patterson v. City of Utica*, 370 F.3d 322, 336 (2d Cir. 2004) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)).  "To plead a violation of procedural due process, . . . a plaintiff must first identify a property right, second show that the government has deprived him of that right, and third show that the deprivation was effected without due process."  *J.S. v. T'Kach*, 714 F.3d 99, 105 (2d Cir. 2013) (citation, alterations, and quotation marks omitted).  "The appropriate process depends on the balancing of three factors: (1) 'the private interest that will be affected by the official action;' (2) 'the risk of erroneous deprivation of such interest through the procedures used;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'"  *Panzella v. Sposato*, 863 F.3d 210, 218 (2d Cir. 2017) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

a.  Plaintiff's Removal from the Residence

Plaintiff argues that he was a tenant when removed from the Residence and thus was denied the due process required to lawfully evict him.  (*See* Compl. ¶ 50; Pl's Hyde Park Opp'n 5–6, 14–16.)  Defendants argue that Plaintiff has alleged facts that indicate only that he was a licensee and thus not entitled to any process.  (*See* Schulhoff Mem. 14–15; Schulhoff Reply 10–12; Hyde Park Defs' Mem. 10–11.)

The Court will first consider whether Plaintiff has alleged sufficient facts to establish his status as a licensee or tenant, as the category he falls within is dispositive of whether he has a property interest in the Residence.  *See Pelt v. City of N.Y.*, No. 11–CV–5633, 2013 WL 4647500, at *8–9 (E.D.N.Y. Aug. 28, 2013) ("Under New York law, it is well settled that a licensee acquires no possessory interest in property." (citation and quotation marks omitted) (collecting cases)); *Gladsky v. Sessa*, No. 06–CV–3134, 2007 WL 2769494, at *8 (E.D.N.Y. Sept. 21, 2007) ("'It has long been the rule in New York that a licensee, as opposed to a tenant . . ., cannot maintain an action for wrongful ejection.'" (quoting *Carter v. Helmsley–Spear, Inc.*, 861 F. Supp. 303, 334 (S.D.N.Y. 1994))).  A licensee has been defined as "[a] person who has a privilege to enter upon land arising from the permission or consent, express or implied, of the possessor of land but who goes on the land for his own purpose rather than for any purpose or interest of the possessor."  *Gladsky*, 2007 WL 2769494, at *8  (alteration in original) (quoting Black's Law Dictionary 921 (6th Ed. 1990)); *see also id*. (noting "[t]his definition is consistent with [the interpretation] employed by New York courts" (citation and quotation marks omitted) (collecting cases)); *Nauth v. Nauth*, 981 N.Y.S.2d 266, 268 (Civ. Ct. 2013) ( "While no explicit definition of 'licensee' is provided [in the relevant section of New York Real Property Actions and Proceedings Law], a licensee in [the] landlord[-]tenant context is generally defined as someone who is granted permission, express or implied, by the owner to use and/or occupy the

subject premises." (citation omitted)).  A license is "cancellable at will, and without cause." *Am. Jewish Theatre, Inc. v. Roundabout Theatre Co., Inc.*, 610 N.Y.S.2d 256, 257 (App. Div. 1994) (citation omitted).  Accordingly, licensees do not have a cognizable property interest in the continued occupancy of a property.  *See Pelt*, 2013 WL 4647500, at *8–9.

New York courts have explained that the "the transfer of absolute control and possession is what differentiates a lease from a license. . . [w]hereas a license connotes use or occupancy of the grantor's premises, a lease grants exclusive possession of designated space to a tenant, subject to rights specifically reserved by the lessor." *Am. Jewish Theatre*, 610 N.Y.S.2d at 257 (citations omitted); *Nextel of N.Y., Inc. v. Time Mgmt. Corp.*, 746 N.Y.S.2d 169, 170 (App. Div. 2002) ("The central distinguishing characteristic of a lease is the surrender of absolute possession and control of property to another party for an agreed-upon rental." (citations and quotation marks omitted)).  While a tenant must be provided with due process pursuant to N.Y. Real Prop. Acts. Law § 711, a licensee may be "peaceably exclude[d] . . . from [a dwelling] without resort to legal process." *Coppa v. LaSpina*, 839 N.Y.S.2d 780, 783 (App. Div. 2007) (citations omitted); *see also Smith v. Cnty. of Nassau*, No. 10-CV-4874, 2015 WL 1507767, at *8 (E.D.N.Y. Mar. 31, 2015) (holding that the plaintiff could not "sustain a due process claim based on his eviction" because "his status as a licensee conferred no cognizable property interest"), *aff'd*, 643 F. App'x 28 (2d Cir. 2016) (summary order); *Visken v. Oriole Realty Corp.*, 759 N.Y.S.2d 523, 525 (App. Div. 2003) ("Since the plaintiff was a mere licensee . . . [the defendant], as owner, had an owner's common-law right to oust her without legal process." (citation omitted)).

Plaintiff has not alleged that he entered into a lease with either Sharon or Janet, but he does claim that "Janet and Plaintiff agreed to an arrangement that had the hallmarks of a lease as

it essentially gave Plaintiff the exclusive occupancy of the Residence[,] until the probate

proceedings were completed[,] in return for the benefit of having Plaintiff's full-time presence at

and ongoing maintenance of the house." (Pl's Hyde Park Opp'n 15.) However, as noted above,

New York courts determine whether a tenancy exists by considering whether the alleged tenant

was granted "exclusive possession of designated space . . . , subject to rights specifically

reserved by the lessor." *Am. Jewish Theatre*, 610 N.Y.S.2d at 257; *see also Andrews v. Acacia

Network*, 70 N.Y.S.3d 744, 745 (App. Term 2018) (finding resident was not a tenant of

supportive living facility in part because facility had not granted "exclusive dominion and

control of a specifically identified portion of the premises" to him). Here, Janet specifically

prohibited Plaintiff and his wife from moving any items out of the Residence and also requested

that Plaintiff install security cameras at the Residence, which, by Plaintiff's own admission, she

monitored once Plaintiff had installed them. (Pl's Hyde Park Opp'n 5–6.) Even drawing all

inferences in Plaintiff's favor, Janet sought to *prevent* Plaintiff from exercising exclusive control

over the Residence. As such, the Court finds that Plaintiff's assertion of what is essentially a

legal conclusion that he was Janet's tenant is untenable. The record, even read in the light most

favorable to Plaintiff, indicates that he was a licensee at the time of the events alleged.[9] As such,

---

[9] Plaintiff cites to *UHAB HDFC v. Diaz*, 809 N.Y.S.2d 484 (App. Div. 2005) to support his claim that the improvements he made at the Residence converted his license to a tenancy-at-will. (Pl's Hyde Park Opp'n 14.) However, *UHAB* is readily distinguishable from the facts of Plaintiff's case; the licensee there had lived in the apartment at issue for 20 years after the previous tenant vacated it, had paid dues to the building's homestead association, and had spent $20,000 repairing the apartment under a sweat equity arrangement. *Id.* at 484.
　　Along similar lines, Plaintiff argues that he had been granted an irrevocable license based on the improvements he made to the Residence. (Pl's Hyde Park Opp'n 5–6.) Under New York law, an irrevocable license "may be found where there is an agreement founded on consideration and the licensee altered his or her position in reliance on the license." *Prosser v. Gouveia*, 470 N.Y.S.2d 231, 232 (App. Div. 1983) (citation omitted); *see also Miller v. Seibt*, 788 N.Y.S.2d 126, 128 (App. Div. 2004) (finding that "99-year agreement to use and occupy . . . barn . . . was valid since it constituted an irrevocable license based upon [the licensee's] expenditure of

Plaintiff need not have been provided any process before being removed from the Residence. *See Coppa*, 839 N.Y.S.2d at 783 (explaining that a licensee may be "peaceably exclude[d] . . . from [a dwelling] without resort to legal process."). Accordingly, the Officer Defendants did not act wrongfully when they evicted Plaintiff based on Janet's report that he was removing property that belonged to Sharon's estate from the Residence. *See Coppa*, 839 N.Y.S.2d at 783; *Visken*, 759 N.Y.S.2d at 525; *Smith*, 2015 WL 1507767, at *8.

### b. Plaintiff's Tools

"When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Hellenic Am. Neighborhood Action Comm. (HANAC) v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996) (citing, inter alia, *Hudson v. Palmer*, 468 U.S. 517, 532 (1984)). Plaintiff does not allege that Defendants acted pursuant to established state procedures; in fact, he alleges that neither New York nor the Town of Hyde Park has any procedures that govern the conduct at issue. (*See* Pl's Hyde Park Opp'n 11 ("Plaintiff has been unable to locate an official procedure that State Troopers or Hyde Park

---

substantial funds to renovate the structure, and the fact that he changed his position in reliance on the agreement."). Plaintiff's argument fails because it is not evident that he changed his position in reliance on the license. First, Plaintiff admits that he understood from his conversations with Janet that he was authorized to continue living at the Residence only "until the probate proceedings were completed[.]" (Pl's Hyde Park Opp'n 15.) While he alleges that he expended some funds to maintain the Residence (*see* Compl. at ¶ 11; Pl's Hyde Park Opp'n 3–4), those expenses appear to have been largely in the normal course and as such insufficient to support that he changed his position in reliance on the license. *See Faith United Christian Church, Inc. v. United Christian Church, Inc.*, 698 N.Y.S.2d 874, 874 (App. Div. 1999) (holding that a license was revocable because there was "no evidence . . . that the [licensee] changed its position with respect to the premises, or expended any moneys in excess of ordinary maintenance and repairs").

Plaintiff also argues, relying on *757 3rd Ave. Assocs., LLC v. Patel*, 985 N.Y.S.2d 57 (Sup. Ct. 2014), that Janet was equitably estopped from evicting him, but *Patel* is inapposite because the court there was addressing how to interpret the effect of a written amendment to a lease in a dispute between a landlord and tenant, *id.* at 60.

Police officers have been directed to follow when they encounter disputes regarding whether a person has a lawful right to occupy a home or dispute over specific chattel. . . . [N]either agency has a procedure requiring officers to provide written notices to persons being evicted who dispute the validity of their eviction or depriv[ation] of their chattel.").)

Plaintiff's claim must, then, be based on Defendants' "random, unauthorized acts." *HANAC*, 101 F.3d at 880.  The Second Circuit has held that, for such claims, "the Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful post[-]deprivation remedy." *Id.* (citing *Hudson*, 468 U.S. at 531).  Put differently, where a state employee's random, unauthorized act makes "a pre-deprivation hearing . . . impractical and a post-deprivation hearing is meaningful, the State satisfies its constitutional obligations by providing the latter." *Stokes v. City of Mount Vernon*, No. 11-CV-7675, 2012 WL 3536461, at *9 (S.D.N.Y. Aug. 14, 2012) (quoting *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984)), *modified in part on reconsideration*, 2012 WL 6691078 (S.D.N.Y. Dec. 17, 2012).

In applying this doctrine, "the Second Circuit has determined that 'New York in fact affords an adequate post-deprivation remedy in the form of, inter alia, a Court of Claims action.'" *Acevedo v. Fischer*, No. 12-CV-6866, 2014 WL 5015470, at *13 (S.D.N.Y. Sept. 29, 2014) (italics omitted) (quoting *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001)); *see also Malik v. City of N.Y.*, No. 11-CV-6062, 2012 WL 3345317, at *11 (S.D.N.Y. Aug. 15, 2012) ("New York provides such an adequate post-deprivation remedy in the form of state law causes of action for negligence, replevin, and conversion." (collecting cases)), *report and recommendation adopted*, 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012).

Because Plaintiff has available adequate post-deprivation remedies, Plaintiff's Fourteenth Amendment claim related to his tools is dismissed.

### 2. Fourth Amendment

The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "A search occurs when the Government acquires information by either physically intruding on persons, houses, papers, or effects, or otherwise invading an area in which the individual has a reasonable expectation of privacy." *United States v. Ganias*, 755 F.3d 125, 133 (2d Cir. 2014) (quotation marks and citation omitted), *on reh'g en banc*, 824 F.3d 199 (2d Cir. 2016). "A seizure occurs when the Government interferes in some meaningful way with the individual's possession of property." *Id.* "The Fourth Amendment's warrant requirement protects one's privacy interest in home or property. Absent exigent circumstances or some other exception, [law enforcement officials] must obtain a warrant before they enter the home to conduct a search or otherwise intrude on an individual's legitimate expectation of privacy." *United States v. Gori*, 230 F.3d 44, 50 (2d Cir. 2000). Similarly, to be valid a "warrantless seizure must meet one of the recognized exceptions to the [F]ourth [A]mendment's warrant requirement." *United States v. Cosme*, 796 F.3d 226, 235 (2d Cir. 2015) (quotation marks and citation omitted).

The Supreme Court has "uniformly [ ] held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *El-Nahal v. Yassky*, 835 F.3d 248, 253 n.2 (2d Cir. 2016) (quoting *Smith v. Maryland*, 442 U.S. 735, 740

(1979)).  "Thus, a Fourth Amendment search[ ] . . . does not occur unless the search invades an object or area [in which] one has a subjective expectation of privacy that society is prepared to accept as objectively reasonable."  *United States v. Ulbricht*, 858 F.3d 71, 96 (2d Cir. 2017) (alterations in original) (quoting *United States v. Hayes*, 551 F.3d 138, 143 (2d Cir. 2008) (quotation marks omitted)); *see also Illinois v. Caballes*, 543 U.S. 405, 408 (2005) ("Official conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment." (quotation marks omitted)).

"A [plaintiff] can demonstrate that his . . . legitimate expectation of privacy has been infringed by showing that he owns the premises or property subjected to search, or by showing that he occupies and has dominion and control over the premises or property by leave of the owner."  *Gill v. City of New York*, No. 15-CV-5513, 2017 WL 1097080, at *5 (E.D.N.Y. Mar. 23, 2017) (alterations and quotation marks omitted) (quoting *United States v. Sanchez*, 635 F.2d 47, 63–64 (2d Cir. 1980)); *Lagasse v. City of Waterbury*, No. 09-CV-391, 2011 WL 2709749, at *9–10 (D. Conn. July 12, 2011) (finding trespasser had no reasonable expectation of privacy and therefore could not object to warrantless entry).  However, an explicit property interest is not always necessary, as, for example, "a guest [who] has permission to use [a] [home], is given a key, and uses the [home] in the owner's absence" may have a reasonable expectation of privacy, "even though no property interest exists."  *United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997) (citation omitted).[10]

---

[10] The Second Circuit has also explained that "[w]hether [an individual] qualifie[s] as a tenant or sublessee is not determinative.  Possessory interests defined in the common law, while sometimes helpful, contain distinctions that are largely historical and do not control the Fourth Amendment inquiry."  *Fields*, 113 F.3d at 320 (citing *Jones v. United States*, 362 U.S. 257, 266 (1960)).

Where an individual has a legitimate expectation of privacy, "[a] warrantless search is per se unreasonable under the Fourth Amendment, unless the search can be justified by one of the narrowly drawn exceptions to the warrant requirement." *United States v. Turner*, 23 F. Supp. 3d 290, 303 (S.D.N.Y. 2014) (italics omitted); *see also Kentucky v. King*, 563 U.S. 452, 459 (2011) ("It is a basic principle of Fourth Amendment law, we have often said, that searches and seizures inside a home without a warrant are presumptively unreasonable.  But we have also recognized that this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness. Accordingly, the warrant requirement is subject to certain reasonable exceptions." (alteration, citations, and quotation marks omitted)); *Steagald v. United States*, 451 U.S. 204, 211 (1981) ("Except in . . . special situations, we have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant.").

One exception to the warrant requirement is where "proper consent" is "voluntarily given." *United States v. Matlock*, 415 U.S. 164, 165–66 (1974).  "Consent may validly be granted by the individual whose property is to be searched, or by a third party who possesses common authority over the premises." *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995) (citation omitted) (citing *Matlock*, 415 U.S. at 171).  When examining whether a third party may consent to the search of a common premises, the inquiry is "whether the third party possessed 'a sufficient relationship to the searched premises to validate the search.'"  *Id.* at 185–86 (quoting *United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir. 1988)).  Accordingly, "a third party may validly grant the requisite consent if [s]he has joint access or control of the property for most purposes," *id.* at 186; *see also United States v. McGee*, 564 F.3d 136, 139 (2d Cir. 2009) ("Authority to consent to a search rests on 'mutual use of the property by persons generally

having joint access or control for most purposes. . . .'" (quoting *Matlock*, 415 U.S. at 171 n.7)),

or "if it was reasonable for the officers to believe [the third party] had the requisite relationship,"

*Elliott*, 50 F.3d at 186 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990)).  Moreover, "if the

search exceeded the scope of the consent given, an officer's objectively reasonable belief that the

search was within the scope of that consent is sufficient to validate the search."  *Id*.  The Second

Circuit has held that a third-party will have actual authority "if two prongs are present: first, the

third party had access to the area searched, and, second, either: (a) common authority over the

area; or (b) a substantial interest in the area; or (c) permission to gain access."  *United States v.*

*Davis*, 967 F.2d 84, 87 (2d Cir. 1992).

"[E]ven if a third party lacks actual authority to consent to a search of a particular area,

[s]he still may have apparent authority to consent to the search."  *Moore v. Andreno*, 505 F.3d

203, 209 (2d Cir. 2007) (citing *United States v. Buckner*, 473 F.3d 551, 555 (4th Cir. 2007)).

"The Supreme Court has explained that apparent authority to give consent 'must be judged

against an objective standard: would the facts available to the officer at the moment . . . warrant a

man of reasonable caution in the belief that the consenting party had authority over the

premises?'"  *McGee*, 564 F.3d at 139.  Additionally, "[the] apparent authority rule applies only

to mistakes of fact and not mistakes of law."  *Moore*, 505 F.3d at 209 (alterations and quotation

marks omitted) (citing, inter alia, *United States v. Brown*, 961 F.2d 1039, 1041 (2d Cir. 1992)

(per curiam) ("*Rodriguez* would not validate, however, a search premised upon an erroneous

view of the law.  For example, an investigator's erroneous belief that landladies are generally

authorized to consent to a search of a tenant's premises could not provide the authorization

necessary for a warrantless search." (citation omitted)).

Under the automobile exception to the warrant requirement, "officers 'may conduct a warrantless search of a movable vehicle when they have probable cause to believe it contains contraband or evidence of a crime.'"  *Martinez v. City of New York*, 564 F. Supp. 3d 88, 99 (E.D.N.Y. 2021) (quoting *United States v. Vassiliou*, 820 F.2d 28, 30 (2d Cir. 1987)); *see also Florida v. Harris*, 568 U.S. 237, 243 (2013) (holding that a police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present).  "The Supreme Court has justified the automobile exception under two rationales: first, 'a person's expectation of privacy in a vehicle is less than his or her expectation of privacy in a home'; and second, 'because a vehicle is readily movable, exigent circumstances might require a warrantless search.'"  *United States v. Samms*, No. 22-CR-130, 2023 WL 386819, at *9 (D. Conn. Jan. 25, 2023) (quoting *United States v. Howard*, 489 F.3d 484, 492 (2d Cir. 2007)).

As an initial matter, the Court finds that Plaintiff, as a licensee who was staying at the Residence with Janet's permission, had a reasonable expectation of privacy in the Residence that was infringed by the warrantless search.  *See United States v. Banerman*, 552 F.2d 61, 64 (2d Cir. 1977) (finding that defendants "lawfully on the premises as licensees or guests" could object to search); *cf. United States v. Blitz*, 199 F. Supp. 326, 327 (E.D.N.Y. 1961) (holding that "licensee who was on the premises with the permission of its owner" had standing to raise Fourth Amendment claim).[11]

However even though Plaintiff had a reasonable expectation of privacy, the Court may find that the warrantless search of the Residence did not violate the Fourth Amendment if Janet

---

[11] Plaintiff has alleged that Janet did not report that he was trespassing at the Residence to law enforcement officials.  (*See* Pl's Hyde Park Opp'n 6.)

had actual or apparent authority to consent to the Officer Defendants conducting the search.[12]

Whether Janet had actual authority over the Residence is a difficult question, as it is unclear from

Plaintiff's allegations whether she had a key to the Residence at the time she made her report,

and thus, had access to the area to be searched.  (*See* Pl's Hyde Park Opp'n 8); *see also Davis*,

967 F.2d at 87 (explaining that actual authority requires that a "third party [have] access to the

area searched").  The lack of a key is not necessarily dispositive, as the Second Circuit has not

"[']delimited the requisite 'access' necessary to satisfy the first prong of the *Davis* test.'"

*Moore*, 505 F.3d at 210 (quoting *Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 53 (2d Cir.

2003)).  In particular, it remains unclear whether "access must mean *physical* access and not

legal access."  *Ehrlich*, 348 F.3d at 60 (emphasis in original).  The Second Circuit has suggested

that physical access, standing alone, is likely insufficient.  *Moore*, 505 F.3d at 210 (explaining

that it was "arguable whether [the defendant's girlfriend] possessed the requisite access to [the

study] where . . . [the girlfriend] had . . . cut the locks on the study door" by the time law

enforcement arrived but had never been granted access by the room's owner).  Whether legal

access alone is enough is also an open question, as the Second Circuit in *Ehrlich* declined to

decide whether a letter from a duly appointed conservator authorizing state officials to use force

to enter his ward's former residence and remove property meant that the conservator had access

for Fourth Amendment purposes.  348 F.3d at 60–62.  Because the Second Circuit has not

resolved this question and the issue of Janet's consent may be resolved on the alternative basis of

---

[12] Although Plaintiff has claimed that Janet had not yet been officially appointed
Sharon's executor, *supra* note 3, it is clear to the Court that Plaintiff understood that she was
Sharon's executor and, in effect, the owner of the Residence.

her apparent authority, the Court assumes, without deciding, that Janet did not have actual authority.

The Court finds that, although she likely lacked actual authority, Janet did have apparent authority over the Residence and consented to the search.  According to Plaintiff's allegations, Janet reported to law enforcement officials over the phone that:

> [Plaintiff and his wife] were engaged in "suspicious activity," that they were removing items from the home when they had been expressly told to not remove items without her being present, and that she was the executor of the estate. . . . Janet did not describe any items that Plaintiff and his wife were removing [and] did not actually state they were stealing or trespassing (only that they were removing items from the home without her present).

(Pl's Hyde Park Opp'n 6.)  Janet did not make a direct request to law enforcement officials to search the Residence, but she did state that she owned the Residence and also indicated that Plaintiff and his wife may have been removing property from the Residence without authorization.  A reasonable person would understand that Janet was alleging that a theft was occurring at the Residence and would also understand there was a need to search the Residence for evidence of the alleged theft.  *See United States v. Stone*, No. 05-CR-281, 2007 WL 2727532, at *5 (D. Conn. Sept. 18, 2007) ("[C]onsent 'need not be expressed in any particular form, but can be found from an individual's words, acts, or conduct.'" (quotation marks omitted) (quoting *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993)), *aff'd*, 399 F. App'x 684 (2d Cir. 2010); *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir. 1981) ("[A] search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'").  Thus, the Court finds that a reasonable person in the position of each of the Officer Defendants would have concluded he had consent from a party with the requisite authority over the Residence to search it for evidence of the alleged thefts.  *McGee*, 564 F.3d at 139; *see also United States v. Thomas*, No. 14-CR-31, 2015 WL 164075, at *6 (D. Conn. Jan. 13,

2015) (holding that alleged victim of sex trafficking, who was a minor, had apparent authority to consent to search of hotel room she had access to and stayed in, even though victim was not listed as guest by the hotel), *aff'd sub nom. United States v. Walters*, 678 F. App'x 44 (2d Cir. 2017); *Turner*, 23 F. Supp. 3d at 305 (finding alleged victim of domestic violence had apparent authority to consent to search of suspect's apartment where she had informed law enforcement she had lived with the suspect at the apartment for a substantial period over the previous three months and had returned her keys immediately prior to making a report).[13]

The Court finds that the Officer Defendants' searches of Plaintiff and his wife's cars and seizure of Plaintiff's tools were covered by the automobile exception. As noted, law enforcement officers may search an automobile if they have probable cause to believe it contains

---

[13] The Court notes that it is unclear from Plaintiff's allegations what information the Officer Defendants received about Janet's call, but it is clear that they were in direct contact with Janet over the phone during the search, which the Court interprets as evidence of their knowledge that Janet was the executor of the estate and owner of the Residence. (Pl's Hyde Park Opp'n 8–10.)

Additionally, even without these allegations, the Court can infer that the Officer Defendants had been dispatched by law enforcement officials who had received Janet's call. Under the collective knowledge doctrine, the Court would impute the knowledge of those officials to the Officer Defendants. *See, e.g.*, *United States v. Babilonia*, 854 F.3d 163, 178 (2d Cir. 2017) ("[E]ven if the law enforcement officer actually conducting the search lacks the relevant facts to support probable cause, the search may nonetheless be permissible if the officer acted on the assessment or instructions of other officers who did have such facts.").

The Court notes that the reasonableness of the Officer Defendants' conclusion is also buttressed by clear law entitling law enforcement officials to presume the truthfulness of the reports of crime victims when determining whether they have probable cause to arrest. *See Alexander v. City of Syracuse*, 573 F. Supp. 3d 711, 729 (N.D.N.Y. 2021) ("[C]ourts assume '[t]he veracity of citizen complaints [by] the victims of the very crime they report to the police . . . .'" (second and third alterations in original) (quoting *Miloslavsky v. AES Eng'g Soc., Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992)); *Torres v. City of N.Y.*, No. 16-CV-6719, 2017 WL 4325822, at *3 (E.D.N.Y. Sept. 27, 2017) ("It is well-settled that even where the information on which a police officer relies later turns out to be mistaken, probable cause still exists as long as the arresting officer acted reasonably in relying on that information." (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)). While these holdings do not directly apply in the context of determining whether officers could reasonably rely upon a third party's consent to a search, the Court finds them relevant, given the somewhat unique facts of this case.

evidence of a crime.  *See Martinez*, 564 F. Supp. 3d at 99 ("[O]fficers 'may conduct a

warrantless search of a movable vehicle when they have probable cause to believe it contains

contraband or evidence of a crime.'" (quoting *Vassiliou*, 820 F.2d at 30).   Probable cause exists

"if [an officer], on the basis of the totality of the circumstances, has sufficient knowledge or

reasonably trustworthy information to justify a person of reasonable caution in believing that an

offense has been or is being committed by the person to be arrested."  *United States v. Hawkins*,

37 F.4th 854, 858 (2d Cir. 2022) (per curiam) (citations omitted).  Probable cause is satisfied by

"the kind of fair probability on which reasonable and prudent people . . . act."  *Id.* at 858

(quotation marks omitted) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).  "To establish

probable cause, officers may rely on hearsay."  *Martinez*, 564 F. Supp. 3d at 99 (citing *United

States v. Premises & Real Prop. at 4492 S. Livonia Rd.*, 889 F.2d 1258, 1267 (2d Cir. 1989)).

Law enforcement officials are entitled to rely on the veracity of complaints they receive from

victims or eyewitnesses.  *Mittelman v. Cnty. of Rockland*, No. 07-CV-6382, 2013 WL 1248623,

at *11 (S.D.N.Y. Mar. 26, 2013) (granting summary judgment on Fourth Amendment claim

because "[a]s a matter of law, it was reasonable for the police to rely on its veracity in making

their decision to search [the] [p]laintiffs' home") (citing *Bernard*, 25 F.3d at 102).

 Here, the Court finds that the Officer Defendants had probable cause to search Plaintiff

and his wife's vehicles based on Janet's report that Plaintiff and his wife were moving property

out of the house, (*see* Pl's Hyde Park Opp'n 8), because a reasonable inference from that report

was that Plaintiff may have been moving the property into his and his wife's vehicles.  *See, e.g.,

Micalizzi v. Ciamarra*, 206 F. Supp. 2d 564, 578 (S.D.N.Y. 2002) (holding that the automobile

exception applied where detective who searched automobile was relying on report from fellow

officer that a naked man who had allegedly been exposing himself to children in the area had

been sitting in the car).  Although Janet appears to have been mistaken about what Plaintiff and

his wife were doing and Plaintiff also provided information to the Officer Defendants that

contradicted her version of events, "[i]t is well-settled that even where the information on which

a police officer relies later turns out to be mistaken, probable cause still exists as long as the . . .

officer acted reasonably in relying on that information." *Torres v. City of New York*, No. 16-CV-

6719, 2017 WL 4325822, at *3 (E.D.N.Y. Sept. 27, 2017) (citing *Bernard*, 25 F.3d at 102); *see

also Mittelman*, 2013 WL 1248623, at *11 (concluding that the police were entitled to rely on

reports of witnesses in determining whether to search the plaintiff's home, even though those

reports were later determined to be erroneous); *cf. Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 135

(E.D.N.Y. 1998) (explaining that "[o]nce a police officer has probable cause, he need not explore

'every theoretically plausible claim of innocence before making an arrest[;]' . . . [officers] have

no duty to investigate an exculpatory statement of the accused, and their refusal to do so does not

defeat probable cause." (quoting, inter alia, *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123,

129 (2d Cir. 1997)).  Viewing the totality of the circumstances, the Officer Defendants did not

act unreasonably in searching Plaintiff's car and seizing the tools because, even drawing all

inferences in Plaintiff's favor, there was a fair probability there was evidence of the alleged theft

in the vehicles and that the tools were stolen property with which Plaintiff would have absconded

if they were not seized.  (Pl's Hyde Park Opp'n 10.)  *Cf. Panetta v. Crowley*, 460 F.3d 388, 395–

96 (2d Cir. 2006) (explaining that "'[t]he fact that an innocent explanation may be consistent

with the facts alleged . . .  does not negate probable cause,' and an officer's failure to investigate

an arrestee's protestations of innocence generally does not vitiate probable cause" (alterations in

original) (citations omitted)).

The Court thus concludes that Plaintiff's Fourth Amendment claims should be dismissed.

### 3.  *Monell* Liability

The Hyde Park Defendants argue that Plaintiff has failed to adequately allege a policy or custom that could provide a basis for imposing municipal liability.  (*See* Hyde Park Defs' Mem. 12; Hyde Park Defs' Reply 6.)

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right."  *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013).  However, "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008), *cert. denied*, 558 U.S. 933 (2009).

The fifth element reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor."  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity itself commits a wrong" (emphasis omitted)). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged

constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

Because Plaintiff has failed to allege a violation of his constitutional rights, he cannot assert liability under *Monell*. *See DeRaffele v. City of New Rochelle*, No. 15-CV-282, 2017 WL 2560008, at *6 (S.D.N.Y. June 13, 2017) ("It is well established that a *Monell* claim cannot lie in the absence of an underlying constitutional violation."); *see also Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action . . . ; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." (italics omitted)). Therefore, Plaintiff's *Monell* claim is dismissed.[14]

### 4. Qualified Immunity

Defendants argue that all of the Officer Defendants are entitled to qualified immunity. (*See* Schulhoff Mem. 17–18; Hyde Park Defs' Mem. 11). Because the Court has found that Plaintiff has failed to state a Constitutional claim, the Court declines to consider Defendants' claims of qualified immunity. *See, e.g.*, *Est. of M.D. by DeCosmo v. New York*, 241 F. Supp. 3d 413, 432 n.10 (S.D.N.Y. 2017) ("As the Court finds that Plaintiffs have failed to state a claim for violation of their constitutional rights, the Court declines to consider Defendants' arguments that they are entitled to qualified immunity.").

---

[14] Defendants also assert that Plaintiff has failed to properly allege the personal involvement of any of the Officer Defendants. (*See* Schulhoff Mem. 15–16; Hyde Park Defs' Mem. 11–12.) However, because the Court has found that Plaintiff has failed to plead an underlying constitutional violation, the Court will not consider these arguments.

### 5.  State Claims[15]

Where a district court "has dismissed all claims over which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction" over any remaining claims. *See* 28 U.S.C. § 1367(c)(3).  "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity, in deciding whether to exercise jurisdiction." *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (citation and quotation marks omitted).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) ("It is axiomatic that when all federal claims are eliminated prior to trial, a court should decline to exercise jurisdiction over any remaining pendent state claims." (quotation marks omitted)); *see also Erie Grp. LLC v. Guayaba Capital, LLC*, 110 F. Supp. 3d 501, 511 n.68 (S.D.N.Y. 2015) (same).

The Court finds nothing that distinguishes this Action from "the usual case."  Plaintiff's federal claims have all been dismissed, *see Dellutri v. Village of Elmsford*, 895 F. Supp. 2d 555, 575 (S.D.N.Y. 2012) (declining to exercise supplemental jurisdiction where "th[e] case remains in its initial stages, and the [p]arties have not yet proceeded to discovery"); *Middleton v. United States*, No. 10-CV-6057, 2012 WL 394559, at *1 (E.D.N.Y. Feb. 7, 2012) (declining to exercise supplemental jurisdiction because no federal claims survived a motion to dismiss), and none of

---

[15] The Hyde Park Defendants have argued that the Court should decline Plaintiff's request to construe his pleadings to raise any state claims as they do not appear on the face of his Complaint.  (Hyde Park Defs' Reply 6.)  However, as the Court is bound by precedent to construe Plaintiff's claims liberally and may review matters outside of the Complaint consistent with it, the Court denies this request.  *See Sykes*, 723 F.3d at 403 (citation omitted); *Alsaifullah*, 2013 WL 3972514, at *4 n.3.

the factors that the Supreme Court enunciated in *Cohill*—"judicial economy, convenience, fairness, [or] comity"—militates against such dismissal, 484 U.S. at 350 n.7.  Thus, Plaintiff's state claims are dismissed without prejudice.

### III.  Conclusion

For the above reasons, the Court grants Defendants' Motions To Dismiss.  However, in light of Plaintiff's pro se status, and because this is the first adjudication of his claims on the merits, Plaintiff's claims are dismissed without prejudice.  If Plaintiff wishes to file an Amended Complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within 30 days of the date of this Order.  The amended complaint will replace, not supplement, the original and first amended complaint.  The failure to timely file an amended complaint may result in the dismissal of this Action with prejudice.  The Clerk of Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 18, 20.)

SO ORDERED.

Dated:   March 27, 2023
         White Plains, New York

_____
            KENNETH M. KARAS
          United States District Judge