UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DANIEL KISS,

                                  Plaintiff,

        v.

RAFAEL A. TORRES, *et al.*,

                                  Defendants.

No. 21-CV-10391 (KMK)

OPINION & ORDER

---

Appearances:

Daniel Kiss
Poughkeepsie, NY
*Pro Se Plaintiff*

Daniel S. Kirschbaum, Esq.
Office of the New York State Attorney General
New York, NY
*Counsel for Defendant James Schulhoff*

James A. Randazzo, Esq.
Drew W. Sumner, Esq.
Portale Randazzo LLP
White Plains, NY
*Counsel for Defendants Rafael Torres, Town of Hyde Park, Daniel Ferrara, Michael Stallone, Joshua Tucker*

KENNETH M. KARAS, United States District Judge:

Plaintiff Daniel Kiss ("Plaintiff") brings this Action pro se against Hyde Park Police

Officers Rafael Torres ("Torres"), Daniel Ferrara ("Ferrara"), Michael Stallone ("Stallone"), and

Joshua Tucker ("Tucker"), as well as New York State Trooper James Schulhoff ("Schulhoff,"

and collectively the "Officer Defendants" or the "Officers"); and the Town of Hyde Park ("Hyde

Park," and with the Officer Defendants, the "Defendants").[1]  (*See* Am. Compl. (Dkt. No. 39).) As in his initial Complaint, Plaintiff raises various claims pursuant to 42 U.S.C. § 1983 ("§ 1983"), alleging violations of his rights under the Fourth and Fourteenth Amendments, and also—construing his pleadings liberally as the Court must—brings a number of claims under New York state law, including unlawful detainer, unlawful eviction, conversion, false arrest, unlawful seizure of Plaintiff's person and property, negligence, and intentional and negligent infliction of emotional distress.  (*See* Am. Compl. ¶¶ 4, 66–88; Pl's Opp'n to Schulhoff's Mot. To Dismiss ("Pl's Schulhoff Opp'n") 2, 22–24 (Dkt. No. 60); Pl's Opp'n to Hyde Park Defs' Mot. To Dismiss ("Pl's Hyde Park Opp'n") 2, 22–24 (Dkt. No. 61).)[2]  Before the Court are Schulhoff's and the Hyde Park Defendants' respective Motions To Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motions").  (*See* Schulhoff Not. of Mot. (Dkt. No. 47); Hyde Park Defs' Not. of Mot. (Dkt. No. 49).)[3]  For the reasons that follow, Defendants' Motions are granted in part, and denied in part.

---

[1] Hyde Park, Torres, Ferrara, Stallone, and Tucker will be collectively referred to herein as the "Hyde Park Defendants."

[2] The Court cites to the ECF-stamped page number at the upper right-hand corner of all documents, unless otherwise noted.

[3] Although Schulhoff's Notice of Motion states that he is seeking to dismiss the Amended Complaint pursuant to Rule 12(b)(1) as well, (*see* Schulhoff Not. of Mot. 1), it does so in a boilerplate fashion and, in addition, Schulhoff fails to argue in his papers that the Court should dismiss this case for lack of subject matter jurisdiction, (*see generally* Mem. of Law in Supp. of Mot. To Dismiss ("Schulhoff Mem.") (Dkt. No. 48); *see also id.* at 11 (merely listing the standard of review for Rule 12(b)(1) motions)).  *See* Fed. R. Civ. P. 12(b)(1).  In any event, the Court is satisfied that—at this juncture—it has subject matter jurisdiction over this Action, which was brought in large part pursuant to § 1983.  *See* 28 U.S.C. § 1331 (providing that "district courts shall have original jurisdiction of all civil actions arising under[, among other things] the . . . laws[] . . . of the United States[]").

I.  Background

A.  Materials Considered

Beyond the allegations in his Amended Complaint, Plaintiff has—again, (*see* Op.

& Order ("March 2023 Op.") 2 & n.1 (Dkt. No. 36))—raised numerous additional factual

assertions in his Opposition briefs, (*see generally, e.g.*, Pl's Schulhoff Opp'n.)[4]

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the

pleadings themselves" because "[t]o go beyond the allegations in the Complaint would convert

the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56." *Thomas v.*

*Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002).

"Nevertheless, the Court's consideration of documents attached to, or incorporated by reference

in the Complaint, and matters of which judicial notice may be taken, would not convert the

motion to dismiss into one for summary judgment." *Id.*; *see also Bellin v. Zucker*, 6 F.4th 463,

473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts

may "consider the complaint in its entirety . . . , documents incorporated into the complaint by

reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu*

*v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the

court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or

incorporated by reference in the pleadings, and matters of which judicial notice may be taken.'"

(alteration adopted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

However, when reviewing a complaint submitted by a pro se plaintiff, the Court may also

consider "materials outside the complaint to the extent that they are consistent with the

---

[4] Having closely reviewed Plaintiff's Opposition briefs, the Court notes that they are
virtually identical to one another.  (*Compare* Pl's Schulhoff Opp'n, *with* Pl's Hyde Park Opp'n.)
Thus, for the sake of clarity and concision, the Court will, in general, cite only to Plaintiff's
Opposition to Schulhoff's Motion for factual propositions.

allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at \*4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "[the plaintiff's] opposition memorandum," *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at \*1 n.2 (S.D.N.Y. Nov. 17, 1997), "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at \*4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a defendant's] request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at \*2 (E.D.N.Y. Sept. 19, 2013), and "documents either in [the plaintiff's] possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted).

Because Plaintiff is proceeding pro se, the Court will again consider the factual assertions raised for the first time in his Opposition briefs to the extent they are consistent with the Amended Complaint. *See Gadson*, 1997 WL 714878, at \*1 n.2; *accord Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a pro se party in his papers opposing the motion." (italics omitted)); *Haywood v. Annucci*, No. 18-CV-10913, 2020 WL 5751530, at \*1 n.1 (S.D.N.Y. Sept. 25, 2020) ("Where appropriate, the Court also considers factual allegations contained in Plaintiff's opposition papers, to the extent that those allegations are consistent with the Amended Complaint."). (*See also* March 2023 Op. 2 & n.1 (considering Plaintiff's Opposition briefs in connection with deciding Defendants' first Motions To Dismiss).)

B.  Factual Background

Unless otherwise stated, the following facts are drawn from the Amended Complaint and Plaintiff's Opposition briefs. (*See generally* Am. Compl.; Pl's Schulhoff Opp'n.) The facts alleged are assumed true for the purpose of resolving the instant Motions. *See Div. 1181*

*Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam). However, given that Plaintiff's Amended Complaint is replete with legal conclusions, (*see, e.g.*, Am. Compl. ¶ 57 ("As the legitimate tenant in the Residence [at issue] on February 13, 2020, Plaintiff had a reasonable expectation of privacy and a right to due process, including notice of termination of his tenancy and a reasonable opportunity to recover his personal belongings, prior to being forcibly evicted from his home."), the Court emphasizes at the outset that it need not—and will not—accept such conclusions as true, *Cadet v. All. Nursing Staffing of N.Y., Inc.*, 632 F. Supp. 3d 202, 219 (S.D.N.Y. 2022) ("Even in the pro se context, the Court is not bound to accept 'conclusory allegations or legal conclusions masquerading as factual conclusions.'" (italics omitted) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008))).

### 1. Plaintiff's Arrangement with Members of the Kenny Family

Since as early as 2010, Plaintiff helped care for Jules Kenny ("Jules"), the ailing father of his close friend Sharon Kenny ("Sharon"), and in return was paid "an hourly rate." (Am. Compl. ¶¶ 11–12.) Years before that, Plaintiff and Sharon had been engaged—though they did not, in fact, marry—"and continued to remain very close friends" over the years, such that Sharon trusted Plaintiff with Jules' care. (*Id.* ¶ 11.) In or around 2018, following a divorce, Sharon "confided in Plaintiff that she was feeling emotionally and physically overwhelmed by taking care of Jules, who was [then around eighty years old], physically frail[,] and suffering from dementia[,]" so she asked Plaintiff to "increase his hours assisting with Jules' care." (*Id.* ¶ 12.) Although he was willing to increase his hours caring for Jules, Plaintiff was living in New Jersey at that time, and was therefore not interested in commuting to Sharon and Jules' home at 4 Potter Bend, Hyde Park, New York (the "Residence"). (*Id.* ¶ 13; Pl's Schulhoff Opp'n 3.) So, Sharon "suggested a solution" that "offered a mutually beneficial living arrangement[,]" where "she

5

would give Plaintiff [and his wife access to their] own room in the Residence [for an indefinite period of time] and, in addition to assisting with Jules at the same hourly rate, Plaintiff would contribute to expenses[,] and would provide maintenance and repair around the Residence." (Am. Compl. ¶ 13; Pl's Schulhoff Opp'n 2–3.)[5]

Ultimately, Plaintiff took Sharon up on her offer and, in June 2019, he "moved all of his personal belongings into the Residence," "storing quite a few of his belongings in the basement and attic." (Am. Compl. ¶¶ 14, 16.) As alleged, Plaintiff and his wife received a second-floor bedroom for their own, exclusive use, and they shared the remainder of the Residence, except for Sharon's bedroom, with Sharon and Jules. (*See id.* ¶ 14; Pl's Schulhoff Opp'n 3.) Plaintiff and Sharon had an understanding pursuant to which Plaintiff "would . . . contribute to the maintenance and cost of the Residence." (Am. Compl. ¶ 14.)

From June 2019 until December 17, 2019, Plaintiff and his wife made the Residence their home. (Am. Compl. ¶ 15; Pl's Schulhoff Opp'n 3.) During that time, "Plaintiff continued helping Sharon with caretaking for Jules at the same hourly rate as before, but in return for the exclusive use of [his r]oom and shared access to the rest of the Residence, he also contributed to the maintenance and cost of the Residence and provided companionship to Sharon." (Am. Compl. ¶ 15.) In terms of improvements and maintenance, Plaintiff built a shed in the backyard of the Residence, repaired and painted the "back deck" and various areas in the Residence, and repaired or replaced various fixtures in the residence, "all using his own money." (*Id.*; Pl's Schulhoff Opp'n 4.) "Plaintiff also contributed regularly and meaningfully to the ongoing

---

[5] Plaintiff asserts in his Opposition briefing that Sharon suggested Plaintiff could "rent a room" in the Residence. (Pl's Schulhoff Opp'n 3.)

maintenance and living expenses at the Residence, including utilities, landscaping, cleaning and grocery shopping." (*Id.* ¶ 15.)[6]

On December 17, 2019, Sharon died suddenly in a skiing accident. (*Id.* ¶ 17.) At that time, "Sharon's family assured Plaintiff that he was like family to them and asked him to remain living at the Residence." (*Id.* ¶ 18.) Moreover, Sharon's sisters Janet Kenny ("Janet") and Debra Rubin ("Debra") asked that Plaintiff and his wife "continue the arrangement they had had with Sharon, continuing to provide care for Jules and caring for and maintaining the Residence." (*Id.*) Janet and Debra also authorized Plaintiff to call the authorities if Sharon's ex-husband came to the Residence. (*Id.*) According to Plaintiff, his understanding with Janet and Debra was that he would continue living at the Residence until the probate proceedings for Sharon's estate took place on March 20, 2020. (*Id.* ¶¶ 19, 25.)[7] As he put it, "Janet and Debra strongly urged Plaintiff and his wife to [continue living] at the Residence, explaining that they wanted Plaintiff to remain [there] until probate proceedings for Janet's [e]state were settled because they said it would be better to have someone living in the Residence for security and insurance purposes." (*Id.* ¶ 24.)[8] Plaintiff agreed to continuing living at the Residence and, therefore, delayed looking for alternative living arraignments. (*See id.* ¶ 25.)

---

[6] Plaintiff also "made himself available on an as-needed basis as a care-taker [sic], a handyman[,] and a friend." (Am. Compl. ¶ 16.)

[7] Plaintiff alleges that Sharon died intestate, such that her entire estate passed to Jules as her sole heir. (Am. Compl. ¶ 22.) He also states that immediately after Sharon's death, Janet "began asserting that she was the administrator of Sharon's [e]state." (Pl's Schulhoff Opp'n 4.)

[8] With regard to security, Kenny family members went so far as to install security cameras on the outside of the Residence, telling Plaintiff it was for his protection. (Am. Compl. ¶ 24.)

After Sharon's death, her family members visited the Residence on multiple occasions, and "appeared to either inventory or take most items of valuable personal property, including all of the computers in the house and the petty cash that Sharon had there which had been used primarily to cover expenses for Jules' care." (*Id.* ¶ 21.) These family members "always called Plaintiff before visiting the Residence," did not enter Plaintiff and his wife's room during their visits, and "explicitly stated to Plaintiff on one occasion that they had taken all of the items that were of value to them and were expecting to dispose of anything left." (*Id.* ¶¶ 20–21.)

On January 29, 2020, Jules' family members moved him to a senior care facility, but Plaintiff continued living in the Residence at Janet and other Kenny family members' request. (*Id.* ¶ 23; Pl's Schulhoff Opp'n 5.) Thus, he and his wife had the Residence to themselves until February 13, 2020. (Am. Compl. ¶ 25.) During that time, Plaintiff mentioned to Janet that he was going to start moving his personal property out of the Residence, but Janet's "reaction was unequivocal"—she "strongly discouraged him from moving out and forbade Plaintiff from removing any items from the Residence, even though Plaintiff advised Janet that he had all of his personal belongings stored there." (*Id.* ¶ 26 (emphasis omitted).) According to Plaintiff, Janet lived in Florida, but she insisted that he could not remove anything from the Residence unless she was physically present. (*Id.*) Indeed, Plaintiff alleges that Janet called his wife and threatened to call the police if they attempted to remove anything from the Residence "because she did not know what belonged to them" and what belonged to Sharon's estate. (*Id.*)

### 2. Events of February 13, 2020

On the morning of February 13, 2020, Janet called Plaintiff to inform him that Jules had died. (Am. Compl. ¶ 27.)[9] That afternoon, Janet—who had been observing Plaintiff and his wife on external security cameras, (Pl's Schulhoff Opp'n 6)—proceeded to call the police to report "that she was the executor of the estate with legal ownership of the property, that Plaintiff was in the Residence without authorization[,] and that Plaintiff was criminally removing property from the Residence that did not belong to him," (Am. Compl. ¶ 29).[10] Plaintiff alleges that Janet was aware that she was making a false report to the police. (*See id.*) Additionally, Plaintiff alleges that Janet "acknowledged that she was calling from her home in Florida"; that she "falsely reported that she had witnessed through a remote security camera a burglary at the Residence because she claimed to have seen Plaintiff taking various items out of the Residence without her permission"; and that she "was unable to specify what property was being removed from the Residence or even that it was the Estate's property rather than Plaintiff's." (*Id.*; *see also* Pl's Schulhoff Opp'n 6.)

In response to Janet's call, the Officer Defendants were all dispatched to the Residence to investigate "suspicious activity" and arrived—with neither a search warrant nor a warrant of eviction, (Pl's Schulhoff Opp'n 2)—at around the same time, (Am. Compl. ¶¶ 31, 33).[11] Some of the Officer Defendants went around to the back of the Residence rather than knocking on the

---

[9] Plaintiff alleges that when Jules died, his will named a trust as the sole beneficiary of his estate, including the Residence, and that Debra was the sole trustee of the estate, such that Janet was neither a beneficiary under, nor the executor of, Jules' will. (Am. Comp. ¶ 28.)

[10] In his Opposition briefing, Plaintiff asserts that Janet called both "the New York State Police and the Hyde Park Police." (Pl's Schulhoff Opp'n 6.)

[11] With the exception of Schulhoff, Plaintiff does not identify any of the other Officer Defendants by name in connection with his factual allegations. (*See generally* Am. Compl.; Pl's Schulhoff Opp'n.)

front door.  (*Id.* ¶¶ 33–34.)  Plaintiff, who at that time was putting away groceries in the

Residence while his wife was downstairs doing the laundry, (Pl's Schulhoff Opp'n 6–7), heard

some noises, went out onto the back deck, and saw those Officer Defendants, at which point

Schulhoff asked him something like, "what [is] going on here?" (Am. Compl. ¶ 34; Pl's

Schulhoff Opp'n 7).  Startled, Plaintiff responded that he lived in the Residence and that nothing

untoward was going on.  (*See* Am. Compl. ¶ 34.)  Plaintiff alleges that "[s]everal of the [Officer

Defendants, including Schulhoff,] then followed Plaintiff into the Residence" without his

permission and that one of Torres, Ferrara, Stallone, or Tucker "came uninvited through the front

door of the Residence."  (*Id.*; Pl's Schulhoff Opp'n 7.)

　　　　Once the Officer Defendants were inside the Residence, Schulhoff, "with the cooperation

of the other [Officer Defendants], ordered Plaintiff and his wife to stay in the living room."  (Pl's

Schulhoff Opp'n 7; *see also* Am. Compl. ¶ 42.)[12]  At that point, Plaintiff reiterated that he lived

in the Residence, explained that he and his wife were just doing chores, and offered to show the

Officers "the many items of personal belongings that he had in the Residence, some of which

had markings that proved they were his."  (Am. Compl. ¶¶ 35, 37.)  Plaintiff alleges, however,

that the Officer Defendants "completely ignored [his] attempts to explain the situation and would

not give him an opportunity to prove that he was legitimately occupying the Residence."  (*Id.*

¶ 39.)[13]  Further, Plaintiff alleges that "none of the [Defendant] Officers made any effort to verify

---

[12] Plaintiff alleges that, at one point, either Torres, Ferrara, Stallone, or Tucker, "threatened Plaintiff's wife with handcuffing when she got up to use the restroom and check on the laundry[.]"  (Am Compl. ¶ 42.)

[13] Indeed, Plaintiff alleges that the Officer Defendants knew "[he] had at some time legally occupied the Residence because Janet had told them that [he] and his wife had formerly cared for her father at the Residence and were in possession of their own key" and, moreover, that "[t]here was abundant evidence that [he] had been occupying the Residence openly and for an extended period of time[.]"  (Am. Compl. ¶ 39.)

Plaintiff's assertions that he and his wife were legal occupants [of] the Residence and that much of the personal property in the Residence was his."  (*Id.* ¶ 55; *see also* Pl's Schulhoff Opp'n 7.)

After they entered, the Officer Defendants conducted a search of the Residence.  (*See* Am. Compl. ¶¶  3, 41.)  Because Janet had reported that she had seen Plaintiff take items out of the shed at the Residence, Schulhoff took a look outside.  (*Id.* ¶ 43.)  He "stated for everyone to hear that there was no sign of footprints in the freshly fallen snow [along] the path to the shed" and, therefore, that "no one could have gone out to the shed that day."  (*Id.*)

Schulhoff spoke with Janet by phone multiple times during the course of the search and shared what he learned with the other Officer Defendants.  (*See id.* ¶¶ 45, 48.)  Based on these conversations Plaintiff alleges that Schulhoff determined that Janet did not know what items Plaintiff and his wife had purportedly taken out of the Residence, and that Janet "apparently admitted that she did not know which items of personal property actually belonged to Plaintiff," as opposed to the Kenny family.  (*Id.* ¶ 45; *see also* Pl's Schulhoff Opp'n 7–8.)  He further alleges that Schulhoff "asked Janet if she had indeed directed Plaintiff to leave a key for her to pick up the next day," and that "Janet admitted that she had made such a request and that Plaintiff lawfully had keys to the Residence."  (Pl's Schulhoff Opp'n 9.)

While the Officer Defendants were still at the Residence, they told Plaintiff's wife that they wanted to search her car and, as alleged, she felt "intimidated and . . . pressured to [give them her] consent."  (Am. Compl. ¶ 47.)  The Officer Defendants recovered "some groceries as well as a backpack with a computer and some dirty clothes" from Plaintiff's wife's car.  (*Id.*)  Plaintiff's wife informed Schulhoff that the computer belonged to her.  (Pl's Schulhoff Opp'n 8.)  Schulhoff then "called Janet to ask her about the computer and Janet confirmed that she had

already removed all of the computers that belonged" to members of the Kenny family.  (Am. Compl. ¶ 48.)

Next, the Officer Defendants proceeded to search Plaintiff's van, from which they recovered certain power tools and other construction materials.  (*Id.* ¶¶ 50, 52.)[14]  After Plaintiff told the Officers that those items belonged to him, Schulhoff again called Janet and she informed him that "she did not know who owned the construction equipment, even though she knew Plaintiff was a contractor."  (*Id.* ¶ 52.)  Nevertheless, the Officer Defendants "confiscated . . . the power tools and placed them in the [Residence's] garage, depriving [Plaintiff] of the tools he used for his construction work."  (*Id.*)  They also told Plaintiff "he had nothing to worry about, that Janet . . . was coming tomorrow[,] and he would recover the tools then."  (*Id.* ¶ 53.)[15]

Ultimately, the Officer Defendants "ordered Plaintiff and his wife to surrender their keys" and "under the threat of arrest" demanded that they vacate the Residence, thereby forcing Plaintiff to "leave behind his personal items stored" therein.  (*Id.* ¶ 58.)  The Officer Defendants would not allow Plaintiff to retrieve his laptop, even though he offered to "show it was his computer by accessing it with his password" and Janet had confirmed to Schulhoff that any computers belonging to Kenny family members had already been retrieved from the Residence.  (Pl's Schulhoff Opp'n 10.)  Further, the Officers warned Plaintiff and his wife "not to return to the Residence to recover their belongings and advised Plaintiff to contact Janet to recover any

---

[14] Plaintiff alleges that the Officer Defendants "offered their opinion that it looked like Plaintiff was planning on taking items from the [Residence] because he had an empty bucket in his van."  (Am. Compl. ¶ 54.)  He further asserts that his van "was clearly a construction van—basically a giant toolbox"—containing "power tools, boxes of screws and nails, hammers, [and] screwdrivers," among other things.  (Pl's Schulhoff Opp'n 9.)

[15] However, "despite repeated requests to the Kennys and the police, Plaintiff[] has never recovered his tools."  (Am. Compl. ¶ 53.)

property that belonged to them." (Am. Compl. ¶ 60.) The personal property that Plaintiff left behind included "irreplaceable items such as heirlooms[ and] family photo albums." (*Id.* ¶ 59.) Plaintiff and his wife were permitted to take with them "medications they could show were theirs." (Pl's Schulhoff Opp'n 10.)

Following the events of February 13, 2020, Janet "confirmed to the police that nothing had been stolen from the Residence" and she also declined to press any charges against Plaintiff or his wife. (Am. Compl. ¶ 61.) In the time since, "Plaintiff [has] recovered [only] one of his two computers, [his] glasses[,] and his cash, but he was unable to recover the rest of his property." (*Id.* ¶ 63.) In fact, Janet has ignored Plaintiff's "repeated attempts to get his property back." (Pl's Schulhoff Opp'n 10.)[16] "When Plaintiff attempted to go to the police station a short time after [February 13, 2020], they simply gave him a vague direction to 'go to court.'" (*Id.*)

C.  Procedural History[17]

On March 27, 2023, the Court issued an Opinion & Order granting Defendants' first Motions To Dismiss (the "March 2023 Opinion"). (*See generally* March 2023 Op.) In that Opinion, the Court granted Plaintiff leave to file an amended complaint. (*Id.* at 33.) After receiving an extension from the Court, (*see* Dkt. Nos. 37–38), Plaintiff filed his Amended Complaint on May 25, 2023, (*see generally* Am. Compl.).

On June 8, 2023, Schulhoff submitted a letter requesting leave to file a Motion To Dismiss. (*See* Letter from Amanda Yoon, Esq. to Court (June 8, 2023) (Dkt. No. 40).) The

---

[16] Plaintiff alleges that, in January 2022, a New York State Trooper called and directed Plaintiff to stop contacting Janet or Debra to recover his property. (Am. Compl. ¶ 63.). It is unclear whether or not the Trooper was Schulhoff.

[17] The Court assumes the Parties' familiarity with the procedural history of this case as described in its prior Opinion & Order, (*see* March 2023 Op. 8–9), and will therefore recount only the procedural background relevant to the instant Motions.

Court issued an order setting a briefing schedule on June 9, 2023. (*See* Order (Dkt. No. 41).) On June 14, 2023, the Hyde Park Defendants submitted their own letter requesting leave to file a Motion To Dismiss. (*See* Letter from James A. Randazzo, Esq. to Court (June 14, 2023) (Dkt. No. 42).) The Court issued another order setting a briefing schedule for the Hyde Park Defendants' Motion on June 22, 2023. (*See* Order (Dkt. No. 43).) On June 26, 2023, Plaintiff filed a response to Defendants' pre-motion letters. (*See* Letter from Daniel Kiss to Court (June 26, 2023) (Dkt. No. 44).) Thereafter, on July 6, 2023, Schulhoff filed a letter requesting an extension of time to file his Motion such that his briefing schedule would align with that of the Hyde Park Defendants, (*see* Letter from Amanda Yoon, Esq. to Court (July 6, 2023) (Dkt. No. 45)), which request the Court granted that same day, (*see* Order (Dkt. No. 46)).

Defendants filed their respective Motions To Dismiss on July 24, 2023. (*See* Schulhoff Not. of Mot.; Schulhoff Mem.; Hyde Park Defs' Not of Mot.; Decl. of James A. Randazzo in Supp. of Mot. To. Dismiss (Dkt. No. 50); Mem. of Law in Supp. of Mot. To Dismiss ("Hyde Park Defs' Mem.") (Dkt. No. 51).) After Plaintiff missed his deadline to oppose Defendants' Motion—and over a week after Schulhoff's deadline to file his Reply—former counsel for Schulhoff received Plaintiff's Opposition via an email from Plaintiff, so Schulhoff's current counsel submitted a letter to the Court seeking guidance on how to proceed. (*See* Letter from Daniel S. Kirschbaum, Esq. to Court (Sept. 26, 2023) (Dkt. No. 55).) On September 27, 2023, the Court memo endorsed that letter, indicated that it would consider Plaintiff's Opposition, directed counsel to file the Opposition with the Court, and granted Schulhoff until October 17, 2023 to file his Reply. (*See* Memo Endorsement (Dkt. No. 56).) Counsel for the Hyde Park Defendants also received Plaintiff's Opposition to their Motion via email and submitted a similar letter to the Court on September 27, 2023. (*See* Letter from James A. Randazzo, Esq. to Court

14

(Sept. 27, 2023) (Dkt. No. 57).)  The outcome was the same.  (*See* Memo Endorsement (Dkt.

No. 58).)  Ultimately, Plaintiff's two Opposition submissions were filed on October 12, 2023.

(*See* Pl's Schulhoff Opp'n; Pl's Hyde Park Opp'n.)[18]  Pursuant to the Court's orders, (*see* Dkt.

Nos. 56, 58), Defendants' respective Replies were filed on October 17, 2023, (*see* Schulhoff

Reply (Dkt. No. 62); Hyde Park Defs' Reply (Dkt. No. 63)).

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

[or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation

of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint

suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and

quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a

right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim

has been stated adequately, it may be supported by showing any set of facts consistent with the

allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a

claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her]

claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see*

*also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief

---

[18] A duplicate version of the Schulhoff Opposition also appears on the docket.  (*See* Dkt.
No. 59.)

will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id*. at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).  However, as noted, when the complaint is from a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah*, 2013 WL 3972514, at *4 n.3 (quotation marks omitted), including "[plaintiff's] opposition memorandum," *Gadson*, 1997 WL 714878, at *1 n.2, "documents that a pro se litigant attaches to his opposition papers," *Agu*, 2010 WL 5186839, at *4 n.6 (italics omitted), statements by the plaintiff "submitted in response to [a defendant's] request for a pre-motion conference," *Jones*, 2013 WL 5300721, at *2, and "documents either in

[the plaintiff's] possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit," *Chambers*, 282 F.3d at 153 (quotation marks omitted).

Where, as here, a plaintiff proceeds pro se, the court must "construe[] [the plaintiff's] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (citation omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (citation and quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and citation omitted)).

> B.  Analysis

Liberally construed, Plaintiff's Amended Complaint raises numerous claims arising under federal and state law that substantially mirror the claims raised in his original Complaint. First, Plaintiff again alleges that the Officer Defendants violated his Fourteenth Amendment right to procedural due process when they evicted him from the Residence and deprived him of his personal property located at the Residence and in his van. (*See* Am. Compl. 8–9; Pl's Schulhoff Opp'n 19–20; Pl's Hyde Park Opp'n 19–20.) Second, Plaintiff again contends that the Officer Defendants violated his Fourth Amendment right to be free from unlawful searches by entering and searching the Residence and by searching his van. (*See* Am. Compl. 8–9; Pl's Schulhoff Opp'n 13–19; Pl's Hyde Park Opp'n 13–19.) Third, Plaintiff now alleges that the Officer Defendants violated his Fourth Amendment rights when they "seized [him] and restricted his liberty[] when he was peacefully occupying his own home" on February 13, 2020. (Am. Compl. 8–9.) Fourth, Plaintiff asserts a municipal liability claim against Hyde Park pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), based on the alleged actions of Torres,

Ferrara, Stallone, and Tucker. (*See* Compl. 8–9; Pl's Hyde Park Opp'n 11.) Fifth, Plaintiff

raises numerous state claims arising from the same events underlying his federal claims. (*See*

Am. Compl. 9–10; Pl's Schulhoff Opp'n 2, 22–24; Pl's Hyde Park Opp'n 2, 22–24.)

Defendants' responses are likewise rather similar to those made in their initial Motions

To Dismiss. Specifically, with respect to Plaintiff's Fourteenth Amendment claims, they argue

that Plaintiff has failed to state a claim for his alleged eviction because he had no cognizable

property interest in the Residence under New York law, (*see* Schulhoff Mem. 17–19; Hyde Park

Defs' Mem. 8–9), and that he has failed to state a claim for the deprivation of property because

New York provides adequate post-deprivation remedies, (*see* Schulhoff Mem. 19–20; Hyde Park

Defs' Mem. 9–10). Defendants also assert that Plaintiff cannot state a Fourth Amendment claim

for the search of the Residence because the Officer Defendants reasonably believed Janet could

consent to the search of the Residence. (*See* Schulhoff Mem. 11–14; Hyde Park Defs' Mem. 11–

13). Defendants further argue that Plaintiff cannot object on Fourth Amendment grounds to the

search of his van because the Officer Defendants had probable cause to believe that there might

be evidence of a crime in the van such that the automobile exception to the Fourth Amendment

warrant requirement applies. (*See* Schulhoff Mem. 14–16; Hyde Park Defs' Mem. 13–14.)

Additionally, Schulhoff contends that there was no unlawful seizure of Plaintiff's person and,

even if there were, there existed the requisite reasonable suspicion to effect such a seizure. (*See*

Schulhoff Mem. 16–17.)[19] Defendants also assert, again, that the Officer Defendants are entitled

to qualified immunity, (*see* Schulhoff Mem. 21–23; Hyde Park Defs' Mem. 14), and that

---

[19] The Hyde Park Defendants have not moved to dismiss Plaintiff's newly alleged claim
that he was seized in violation of the Fourth Amendment during the events of February 13, 2020.
(*See generally* Hyde Park Defs' Mem.; Hyde Park Defs' Reply.) The Court assumes that this
was a strategic decision on the part of counsel for the Hyde Park Defendants.

Plaintiff failed to properly allege the personal involvement of any of the Officer Defendants, (*see* Schulhoff Mem. 20–21; Hyde Park Defs' Mem. 15).[20]  For their part, the Hyde Park Defendants assert that Plaintiff cannot state a *Monell* claim.  (*See* Hyde Park Defs' Mem. 15–16.)  Finally, with respect to Plaintiff's state-law claims, Schulhoff argues that he is immune for liability for those claims under the common law doctrine of governmental immunity, (*see* Schulhoff Mem. 23–24), and all Defendants argue that—in the event that Plaintiff's federal-law claims are all dismissed—the Court should decline to exercise supplemental jurisdiction over those claims, (*see id.* at 24; Hyde Park Defs' Mem. 16).

The Court will address each of Defendants' arguments to the extent necessary to resolve the instant Motions.

### 1.  Personal Involvement

The Hyde Park Defendants briefly assert—in a single paragraph—that Plaintiff has failed to properly allege the personal involvement of Torres, Ferrara, Stallone, and Tucker.  (*See* Hyde Park Defs' Mem. 15.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under [42 U.S.C.] § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Davila v. Johnson*, No. 15-CV-2665, 2015 WL 8968357, at *4 (S.D.N.Y. Dec. 15, 2015) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)).

---

[20] Schulhoff withdrew his personal-involvement argument on Reply.  (*See* Schulhoff Reply 6 n.1.)

Here, although Plaintiff has not been able to differentiate between the four Hyde Park police officers, he has alleged that they all came to the Residence, entered it, and worked together to search it.  (*See, e.g.*, Am. Compl. ¶¶ 31–34.)  These allegations are sufficient to establish the personal involvement of Torres, Ferrara, Stallone, and Tucker as to the Fourth Amendment claims.  *See Byrne v. Trudell*, No. 12-CV-245, 2013 WL 2237820, at *10 (D. Vt. May 21, 2013) (adopting report and recommendation finding that the plaintiff adequately alleged personal involvement against two officers who conducted warrantless search.).

As to the Fourteenth Amendment claims, Plaintiff has alleged that all of the Officer Defendants were present at the Residence when he was instructed not to return.  (*See, e.g.*, Am. Compl. ¶¶ 58, 60.)  Construed liberally, these allegations are sufficient to demonstrate Torres, Ferrara, Stallone, and Tucker's personal involvement in the alleged constitutional deprivations.

### 2.  Fourteenth Amendment Claims

Next, the Court considers whether Plaintiff has adequately alleged that the Officer Defendants violated his Fourteenth Amendment right to procedural due process.  (*See* Am. Compl. 8–9; Pl's Schulhoff Opp'n 19–20; Pl's Hyde Park Opp'n 19–20.)

The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV, § 1.  The Due Process Clause thus "bars arbitrary, wrongful government actions, and guarantees procedural fairness when a state action deprives a citizen of a protected interest in life, liberty, or property."  *Wiesner v. Rosenberger*, No. 98-CV-1512, 1998 WL 695927, at *3 (S.D.N.Y. Oct. 6, 1998) (citing *Daniels v. Williams*, 474 U.S. 327, 330–32 (1986)); *accord Polardo v. Adelberg*, No. 22-CV-2533, 2023 WL 2664612, at *11 (S.D.N.Y. Mar. 28, 2023).  "The fundamental requirement of the Due Process Clause is that an individual be given the opportunity to be heard at 'a meaningful time and in a meaningful manner.'"  *Patterson v. City of*

*Utica*, 370 F.3d 322, 336 (2d Cir. 2004) (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970));

*accord Smalls v. N.Y.C. Emp.s' Ret. Sys.*, No. 18-CV-5428, 2020 WL 5525746, at *4 (S.D.N.Y.

Sept. 15, 2020).  "To plead a violation of procedural due process, . . . a plaintiff must first

identify a property right, second show that the government has deprived him of that right, and

third show that the deprivation was effected without due process."  *Akinde v. N.Y.C. Health &

Hosp. Corp.*, No. 16-CV-8882, 2019 WL 4392959, at *5 (S.D.N.Y. Sept. 13, 2019) (quoting *J.S.

v. T'Kach*, 714 F.3d 99, 105 (2d Cir. 2013)).  "The appropriate process depends on the balancing

of three factors: (1) 'the private interest that will be affected by the official action;' (2) 'the risk

of erroneous deprivation of such interest through the procedures used;' and (3) 'the

Government's interest, including the function involved and the fiscal and administrative burdens

that the additional or substitute procedural requirement would entail.'"  *Panzella v. Sposato*, 863

F.3d 210, 218 (2d Cir. 2017) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

### a.  Plaintiff's Removal from the Residence

As before, Plaintiff argues that he was a tenant when removed from the Residence and

was therefore denied due process when the Officer Defendants unlawfully evicted him.  (*See*

Am. Compl. ¶ 57; Pl's Schulhoff Opp'n 19–20; Pl's Hyde Park Opp'n 19–20.)  Defendants again

contend that Plaintiff has alleged facts that show he was no more than a mere licensee and thus

not entitled to any process under New York law.  (*See* Schulhoff Mem. 17–19; Hyde Park Defs'

Mem. 8–9.)[21]

---

[21] In response to Plaintiff's procedural due process claim relating to his removal from the
Residence, Schulhoff also asserts that "Plaintiff should be precluded from relitigating this
[issue], under the doctrines of collateral estoppel or 'the law of the case.'"  Schulhoff Reply 11–
12.  As an initial matter, only "[t]he doctrine of the law of the case, rather than . . . collateral
estoppel, [would] appl[y] in a case, such as this one, where there has been no final judgment."
*State Farm Mut. Auto. Ins. Co. v. Mallela*, No. CV-00-4923, 2002 WL 31946762, at *8
(E.D.N.Y. Nov. 21, 2002); *see also Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 80 (2d Cir.
2019) (noting that, inter alia, "a valid and final judgment on the merits" is a required condition to

"Property interests are not created by the Constitution; rather, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Ciambriello v. County of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Thus, the Court first considers whether Plaintiff's Amended Complaint plausibly alleges that he is a tenant, rather than a licensee, because the category he falls within is dispositive of whether he has the requisite property interest in the Residence to state a procedural due process claim. *See Pelt v. City of New York*, No. 11-CV-5633, 2013 WL 4647500, at *8 (E.D.N.Y. Aug. 28, 2013) ("Under New York law, it is well settled that a licensee acquires no possessory interest in property." (citation and quotation marks omitted) (collecting cases)); *Gladsky v. Sessa*, No. 06-CV-3134, 2007 WL 2769494, at *8 (E.D.N.Y. Sept. 21, 2007) ("It has long been the rule in New York that a licensee, as opposed to a tenant . . . , cannot maintain an action for wrongful ejection." (quoting *Carter v. Helmsley-Spear, Inc.*, 861 F. Supp. 303, 334 (S.D.N.Y. 1994))).

A licensee has been defined as "[a] person who has a privilege to enter upon land arising from the permission or consent, express or implied, of the possessor of land but who goes on the land for his own purpose rather than for any purpose or interest of the possessor." *Gladsky*, 2007

---

invoke the doctrine of collateral estoppel. With respect to the law of the case doctrine, in certain circumstances, that doctrine may be invoked in this context, *see, e.g.*, *Chavez v. Gutwein*, No. 20-CV-342, 2022 WL 1487781, at *7 (S.D.N.Y. May 11, 2022) (collecting cases), but "where, as here, a plaintiff has filed an amended complaint following an earlier ruling, the law of the case doctrine does not apply to the extent that the plaintiff has offered new claims or factual allegations," *Streamlined Consultants, Inc. v. EBF Holdings, LLC*, No. 21-CV-9528, 2023 WL 5835748, at *6 (S.D.N.Y. Sept. 8, 2023) (alteration adopted and quotation marks omitted). And, in any event, the Court did not *hold* that Plaintiff was *in fact* a licensee, but rather concluded that, the facts *as alleged* in Plaintiff's initial Complaint only tended to show that he was licensee, and did not plausibly plead that he was a tenant.

WL 2769494, at *8 (alteration in original) (quoting Black's Law Dictionary 921 (6th Ed. 1990));
*see also id*. (noting "[t]his definition is consistent with [the interpretation] employed by New
York courts" (citation and quotation marks omitted) (collecting cases)); *Nauth v. Nauth*, 981
N.Y.S.2d 266, 268 (Civ. Ct. 2013) ("While no explicit definition of 'licensee' is provided [in the
relevant section of New York Real Property Actions and Proceedings Law], a licensee in [the]
landlord[-]tenant context is generally defined as someone who is granted permission, express or
implied, by the owner to use and/or occupy the subject premises." (citation omitted)).  A license
is "cancellable at will, and without cause."  *Am. Jewish Theatre, Inc. v. Roundabout Theatre Co.*,
610 N.Y.S.2d 256, 257 (App. Div. 1994) (citation omitted).  Accordingly, licensees do not have
a cognizable property interest in the continued occupancy of a property.  *See Pelt*, 2013 WL
4647500, at *8–9.

      As set forth in the March 2023 Opinion, (*see* March 2023 Op. 16), New York courts have
explained that "the transfer of absolute control and possession is what differentiates a lease from
a license . . . [w]hereas a license connotes use or occupancy of the grantor's premises, a lease
grants exclusive possession of designated space to a tenant, subject to rights specifically reserved
by the lessor."  *Am. Jewish Theatre*, 610 N.Y.S.2d at 257 (citations omitted); *Nextel of N.Y., Inc.
v. Time Mgmt. Corp.*, 746 N.Y.S.2d 169, 170 (App. Div. 2002) ("The central distinguishing
characteristic of a lease is the surrender of absolute possession and control of property to another
party for an agreed-upon rental." (citations and quotation marks omitted)).  While a tenant must
be provided with due process pursuant to N.Y. Real Prop. Acts. Law § 711, a licensee may be
"peaceably exclude[d] . . . from [a dwelling] without resort to legal process."  *Coppa v. LaSpina*,
839 N.Y.S.2d 780, 783 (App. Div. 2007) (citations omitted); *see also Smith v. County of Nassau*,
No. 10-CV-4874, 2015 WL 1507767, at *8 (E.D.N.Y. Mar. 31, 2015) (holding that the plaintiff

could not "sustain a due process claim based on his eviction" because "his status as a licensee conferred no cognizable property interest"), *aff'd*, 643 F. App'x 28 (2d Cir. 2016) (summary order); *Visken v. Oriole Realty Corp.*, 759 N.Y.S.2d 523, 525 (App. Div. 2003) ("Since the plaintiff was a mere licensee . . . [the defendant], as owner, had an owner's common-law right to oust her without legal process." (citation omitted)).

   In his submissions, Plaintiff alleges that Sharon informed him that she would give him and his wife access to their own room at the Residence—indeed, that she would let them "rent a room"—and that, in return, Plaintiff was expected to contribute to expenses and provide maintenance and repair services at the Residence.  (*See* Am. Compl. ¶¶ 13–14; Pl's Schulhoff Opp'n 2–3.)  Plaintiff further alleges that he and his wife did in fact receive exclusive use of a second-floor room at the Residence, that he contributed to household expenses using his own money, and that he completed a number of household projects at the Residence (again using his own money), such as building a shed in the backyard and repairing a deck.  (*See* Am. Compl. ¶ 15; Pl's Schulhoff Opp'n 4.)  Plaintiff alleges that, after Sharon's untimely passing, Janet and Debra asked that Plaintiff and his wife "continue the arrangement they had had with Sharon, continuing to provide care for Jules and caring for and maintaining the Residence," at least until the probate proceedings for Sharon's estate took place on March 20, 2020.  (*See* Am. Compl. ¶¶ 18–19, 25.)  Moreover, Plaintiff alleges that Janet and Debra further authorized Plaintiff to call the authorities if Sharon's ex-husband came to the Residence.  (Am. Compl. ¶ 18.)  Indeed, "Janet and Debra strongly urged Plaintiff and his wife to [continue living] at the Residence [after they moved Jules out], explaining that they wanted Plaintiff to remain [there] until probate proceedings for Janet's [e]state were settled because they said it would be better to have someone living in the Residence for security and insurance purposes."  (*Id.* ¶ 24.)  And before

the events of February 13, 2020, whenever Kenny family members would visit the Residence—for example, to inventory Sharon's personal property—they would "always call[] Plaintiff" in advance of visiting, and did not enter Plaintiff and his wife's room during their visits." (*Id.* ¶ 20–21.)

In light of that record, and given that it is bound to accept as true Plaintiff's factual allegations at this stage of the case, *see Erickson*, 551 U.S. at 94, the Court finds that Plaintiff has alleged sufficient facts plausibly demonstrating that he was a tenant, rather than a licensee, at the Residence.  In other words, the Amended Complaint—as supplemented by Plaintiff's Opposition, *see supra* Section I.A—plausibly alleges that Plaintiff was granted "exclusive possession of [the Residence] . . . , subject to rights specifically reserved by [Kenny family members]." *Am. Jewish Theatre*, 610 N.Y.S.2d at 257; *see also Fed'n of Orgs., Inc. v. Bauer*, 788 N.Y.S.2d 806, 808 (App. Div. 2004) (explaining that "exclusive possession and control of specified real property" are "essential to the existence of a landlord-tenant relationship"); *Nextel of N.Y., Inc.*, 746 N.Y.S.2d at 170 ("The central distinguishing characteristic of a lease is the surrender of absolute possession and control of property to another party for an agreed-upon rental." (citations omitted)).[22]  Consequently, Plaintiff has adequately alleged that he had a cognizable property interest in the Residence.  *See, e.g.*, *Smith*, 2015 WL 1507767, at *8.  Thus, the Court denies the Defendants' Motions with respect to Plaintiff's procedural due process claim relating to his removal from the Residence.[23]

---

[22] Put another way, the Amended Complaint plausibly alleges that the "manifest intention of the parties," here Plaintiff and various Kenny family members, was for Plaintiff to be a tenant at the Residence.  *Am. Jewish Theatre*, 610 N.Y.S.2d at 257.

[23] Notwithstanding this holding, the Court is not convinced by Plaintiff's reliance on N.Y. Real Prop. Acts. Law § 711.  (*See* Pl's Schulhoff Opp'n 23; Pl's Hyde Park Opp'n 23.)  That provision states:  "A tenant shall include an occupant of one or more rooms in a *rooming house*

25

In their Motions, Defendants fail to seriously engage with the factual allegations in Plaintiff's Amended Complaint.  (*See* Schulhoff Mem. 17–19; Hyde Park Defs' Mem. 8–9.)  For example, Schulhoff asserts that "Plaintiff [has] made no showing that the Kenny family was contractually bound not to enter his room," but fails to cite any authority demonstrating why that assertion matters here.  (Schulhoff Mem. 18.)  Moreover, in response to Plaintiff's Oppositions, rather than address Plaintiff's additional factual allegations, Defendants' Replies do nothing more than double-down on the Court's holding that Plaintiff's original Complaint alleged that he was a mere licensee in the March 2023 Opinion.  (Schulhoff Reply 11–12; Hyde Park Defs' Reply 6.)

To be clear, discovery may well reveal that Plaintiff was, in fact, a licensee at the Residence, and therefore was entitled to no process whatsoever before he was removed from the Residence.  *See Coppa*, 839 N.Y.S.2d at 783 (explaining that a licensee may be "peaceably exclude[d] . . . from [a dwelling] without resort to legal process").  The Court simply holds that Plaintiff has alleged sufficient facts to make it *plausible*, at this juncture, that he was a tenant at the Residence.  *See Twombly*, 550 U.S. at 570 (explaining that, to survive a motion to dismiss, a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face").

### b.  Plaintiff's Personal Property

Plaintiff also asserts that the Officer Defendants violated his right to due process when they deprived him of the personal property that he was forced to leave at the Residence, including, among other things, a laptop, certain construction tools, and "irreplaceable items such as heirlooms[ and] family photo albums."  (Am. Compl. ¶ 59; *see also* Pl's Schulhoff Opp'n 10.)

---

or a resident, not including a transient occupant, of one or more rooms in a *hotel* who has been in possession for thirty consecutive days or longer."  N.Y. Real Prop. Acts. Law § 711 (emphases added).  Nowhere in his submissions has Plaintiff mentioned—much less plausibly alleged—that the Residence is a "rooming house" or "hotel" under New York law.

In their Motions, Defendants assert that there was no due process violation because Plaintiff had "adequate post-deprivation remedies" available to him.  (Schulhoff Mem. 19–20; *see also* Hyde Park Defs' Mem. 9–10 (charactering this argument as Plaintiff's "fail[ure] to exhaust his available post-deprivation remedies under New York state law").)[24]

As explained in the Court's March 2023 Opinion, (*see* March 2023 Op. 18), "[w]hen reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees."  *Hellenic Am. Neighborhood Action Comm.* (*HANAC*) *v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996) (citing, inter alia, *Hudson v. Palmer*, 468 U.S. 517, 532 (1984)); *accord Joseph v. Castillo*, No. 20-CV-3957, 2022 WL 4485061, at *4 (E.D.N.Y. Sept. 27, 2022).  With respect to claims based on random, unauthorized acts by state employees, "the Due Process Clause of the Fourteenth Amendment is not violated when a state employee intentionally deprives an individual of property or liberty, so long as the State provides a meaningful post[-]deprivation remedy."  *HANAC*, 101 F.3d at 880 (citing *Hudson*, 468 U.S. at 531, 533).  In other words, where a state employee's random, unauthorized act makes "a pre-deprivation hearing . . . impractical and a post-deprivation hearing is meaningful, the State satisfies its constitutional obligations by providing the latter."  *Stokes v. City of Mount Vernon*, No. 11-CV-7675, 2012 WL 3536461, at *9 (S.D.N.Y. Aug. 14, 2012) (quoting *Giglio v. Dunn*,

---

[24] Notwithstanding the Hyde Park Defendants' decision to frame their argument in terms of "exhaustion," the Court notes that, in general, "exhaustion of state remedies 'is *not* a prerequisite to an action under § 1983.'"  *Heck v. Humphrey*, 512 U.S. 477, 480 (1994) (emphasis in original) (quoting *Patsy v. Bd. of Regents*, 457 U.S. 496, 501 (1982)); *see also Susser v. N.Y.C. Dep't of Educ.*, No. 22-CV-51, 2023 WL 3765006, at *4 n.2 (E.D.N.Y. June 1, 2023) (same).  Thus, Plaintiff's failure to take advantage of available post-deprivation remedies as discussed herein "does not impose a procedural bar."  *Susser*, 2023 WL 3765006, at *4 n.2.

732 F.2d 1133, 1135 (2d Cir. 1984)), *modified in part on reconsideration*, 2012 WL 6691078 (S.D.N.Y. Dec. 17, 2012).

As to claims based on established state procedures, such conduct occurs when, for example, it is "pursuant to a statute, code, regulation, or custom," or is the result of a decision made by a high-ranking official with "final authority over significant matters." *See Viteritti v. Inc. Village of Bayville*, 918 F. Supp. 2d 126, 134 (E.D.N.Y. 2013) (quoting *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 152 n.3 (2d Cir. 2010)). "When the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of post[-]deprivation procedures will not, ipso facto, satisfy due process." *HANAC*, 101 F.3d at 880 (citing *Hudson*, 468 U.S. at 532). Rather, where a plaintiff is deprived of property "pursuant to an established state procedure, [] some pre-deprivation process [is] required." *Teichmann v. N.Y.C. Emps.' Ret. Sys.*, No. 21-CV-5082, 2022 WL 4237110, at *5 (S.D.N.Y. Sept. 14, 2022); *see also Panzella*, 863 F.3d at 218 (listing the factors courts must balance when determining how much process is due under given circumstances and quoting *Mathews*, 424 U.S. at 335).

Plaintiff's Amended Complaint does not allege that the Officer Defendants acted pursuant to an established state procedure on February 13, 2020. (*See generally* Am. Compl.) However, Plaintiff avers in his Opposition that the Officer Defendants' conduct on February 13, 2020, "suggests" that they were "either following an established law enforcement practice or were empowered to believe that they had broad discretion to adjudicate a dispute between a nonowner resident of a private home and an out-of-state individual claiming to represent an [e]state[-]owner of the home without regard to constitutional protections . . . ." (Pl's Hyde Park Opp'n 12–13; *see also* Pl's Schulhoff Opp'n 12–13.)

"[C]onstru[ing Plaintiff's submissions] liberally and interpret[ing them] to raise the strongest arguments that they suggest," *Sykes*, 723 F.3d at 403, the Court concludes that Plaintiff has plausibly alleged that the Officer Defendants were "following an established . . . practice" when they allegedly deprived him of his personal property during the events of February 13, 2020, (Pl's Hyde Park Opp'n 12–13; Pl's Schulhoff Opp'n 12–13).  Moreover, Plaintiff's allegations throughout his submissions plausibly state that he received *no* pre-deprivation process when he was forced to leave his personal property at the Residence.  *See Teichmann*, 2022 WL 4237110, at *5 (explaining that "*some* pre-deprivation process [is] required" when a plaintiff is deprived of property "pursuant to an established state procedure" (emphasis added)).  Thus, accepting his allegations as true and drawing all reasonable inferences in his favor, Plaintiff has stated a plausible procedural due process claim relating to his personal property.  The Court therefore denies Defendants' Motions To Dismiss this claim.[25]

### 3.  Fourth Amendment Claims

The Court next considers whether Plaintiff has adequately alleged that the Officer Defendants violated his Fourth Amendment rights.  (*See* Am. Compl. 8–9; Pl's Schulhoff Opp'n 13–19; Pl's Hyde Park Opp'n 13–19.)

The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause

---

[25] Notably, Defendants' arguments for dismissal as to this claim all rely on or mirror the Court's March 2023 Opinion dismissing the original, now-superseded Complaint.  (*See* Schulhoff Mem. 19–20; Hyde Park Defs' Mem. 9–10; Schulhoff Reply 9–11; *see also* March 2023 Op. 33 (granting leave to replead and explaining that any amended complaint would "replace, not supplement" the initial Complaint).)  Accordingly, Defendants offer no rebuttal to Plaintiff's allegation that his claim is subject to the more exacting standard applicable to claims based on established state procedures.  *See HANAC*, 101 F.3d at 880.

. . . ." U.S. Const. amend. IV.  "A search occurs when the Government acquires information by either physically intruding on persons, houses, papers, or effects, or otherwise invading an area in which the individual has a reasonable expectation of privacy." *United States v. Ganias*, 755 F.3d 125, 133 (2d Cir. 2014) (quotation marks and citation omitted), *on reh'g en banc*, 824 F.3d 199 (2d Cir. 2016).  "A seizure occurs when the Government interferes in some meaningful way with the individual's possession of property." *Id.*  "The Fourth Amendment's warrant requirement protects one's privacy interest in home or property.  Absent exigent circumstances or some other exception, [law enforcement officials] must obtain a warrant before they enter the home to conduct a search or otherwise intrude on an individual's legitimate expectation of privacy." *United States v. Gori*, 230 F.3d 44, 50 (2d Cir. 2000).  Similarly, to be valid, a "warrantless seizure must meet one of the recognized exceptions to the [F]ourth [A]mendment's warrant requirement." *United States v. Cosme*, 796 F.3d 226, 235 (2d Cir. 2015) (quotation marks and citation omitted).

The Supreme Court has "uniformly [] held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *El-Nahal v. Yassky*, 835 F.3d 248, 253 n.2 (2d Cir. 2016) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).  "Thus, a Fourth Amendment search[] . . . does not occur unless the search invades an object or area [in which] one has a subjective expectation of privacy that society is prepared to accept as objectively reasonable." *United States v. Ulbricht*, 858 F.3d 71, 96 (2d Cir. 2017) (alterations in original) (quotation marks omitted) (quoting *United States v. Hayes*, 551 F.3d 138, 143 (2d Cir. 2008)); *see also Illinois v. Caballes*, 543 U.S. 405, 408 (2005) ("Official conduct

that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment." (quotation marks omitted)).

"A [plaintiff] can demonstrate that his . . . legitimate expectation of privacy has been infringed by showing that he owns the premises or property subjected to search, or by showing that he occupies and has dominion and control over the premises or property by leave of the owner." *Gill v. City of New York*, No. 15-CV-5513, 2017 WL 1097080, at *5 (E.D.N.Y. Mar. 23, 2017) (alterations and quotation marks omitted) (quoting *United States v. Sanchez*, 635 F.2d 47, 63–64 (2d Cir. 1980)); *Lagasse v. City of Waterbury*, No. 09-CV-391, 2011 WL 2709749, at *9–10 (D. Conn. July 12, 2011) (finding trespasser had no reasonable expectation of privacy and therefore could not object to warrantless entry).  However, an explicit property interest is not always necessary, as, for example, "a guest [who] has permission to use [a] [home], is given a key, and uses the [home] in the owner's absence" may have a reasonable expectation of privacy, "even though no property interest exists." *United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997) (citation omitted).[26]

Where an individual has a legitimate expectation of privacy, "[a] warrantless search is per se unreasonable under the Fourth Amendment, unless the search can be justified by one of the narrowly drawn exceptions to the warrant requirement." *United States v. Turner*, 23 F. Supp. 3d 290, 303 (S.D.N.Y. 2014) (italics omitted); *see also Kentucky v. King*, 563 U.S. 452, 459 (2011) ("It is a basic principle of Fourth Amendment law, we have often said, that searches and seizures inside a home without a warrant are presumptively unreasonable.  But we have also recognized

---

[26] The Second Circuit has also explained that "[w]hether [an individual] qualifie[s] as a tenant or sublessee is not determinative.  Possessory interests defined in the common law, while sometimes helpful, contain distinctions that are largely historical and do not control the Fourth Amendment inquiry." *Fields*, 113 F.3d at 320 (citing *Jones v. United States*, 362 U.S. 257, 266 (1960)).

that this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness.  Accordingly, the warrant requirement is subject to certain reasonable exceptions." (alteration, citations, and quotation marks omitted)); *Steagald v. United States*, 451 U.S. 204, 211 (1981) ("Except in . . . special situations, we have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant.").

To start, and for the reasons set forth above, *see supra* Section II.B.2.a, the Court again concludes that Plaintiff had a reasonable expectation of privacy in the Residence.  *See United States v. Ray*, 541 F. Supp. 3d 355, 380 (S.D.N.Y. 2021) ("A defendant can establish that he had a legitimate expectation of privacy with respect to a home sufficient to invoke Fourth Amendment rights 'by showing that he owned the premises or that he occupied them and had dominion and control over them by leave of the owner.'" (quoting *United States v. Watson*, 404 F.3d 163, 166 (2d Cir. 2005)); *see also Dos Santos v. Syracuse Police Dep't,* No. 22-CV-1102, 2023 WL 3612842, at *2 (N.D.N.Y. May 24, 2023) (same).  (*Cf.* March 2023 Op. 24 (finding that Plaintiff had a reasonable expectation of privacy the Residence, even if considered a licensee.)

The Court now considers each of Plaintiff's Fourth Amendment claims in turn.

### a.  Search of the Residence

Plaintiff again alleges that the Officer Defendants violated his Fourth Amendment rights when they searched the Residence without a warrant.  (*See* Am. Compl. 8–9; Pl's Schulhoff Opp'n 13–19; Pl's Hyde Park Opp'n 13–19.)

One exception to the warrant requirement is where "proper consent" is "voluntarily given."  *United States v. Matlock*, 415 U.S. 164, 165–66 (1974).  "Consent may validly be granted by the individual whose property is to be searched, or by a third party who possesses

common authority over the premises." *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995)

(citation omitted) (citing *Matlock*, 415 U.S. at 171).  When examining whether a third party may

consent to the search of a common premises, the inquiry is "whether the third party possessed 'a

sufficient relationship to the searched premises to validate the search.'" *Id.* at 185–86 (quoting

*United States v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir. 1988)).  Accordingly, "a third party may

validly grant the requisite consent if [s]he has joint access or control of the property for most

purposes," *id.* at 186; *see also United States v. McGee*, 564 F.3d 136, 139 (2d Cir. 2009)

("Authority to consent to a search rests on 'mutual use of the property by persons generally

having joint access or control for most purposes . . . .'" (quoting *Matlock*, 415 U.S. at 171 n.7)),

or "if it was reasonable for the officers to believe [the third party] had the requisite relationship,"

*Elliott*, 50 F.3d at 186 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990)).  Moreover, "if the

search exceeded the scope of the consent given, an officer's objectively reasonable belief that the

search was within the scope of that consent is sufficient to validate the search." *Id.*  The Second

Circuit has held that a third-party will have actual authority "if two prongs are present: first, the

third party had access to the area searched, and, second, either: (a) common authority over the

area; or (b) a substantial interest in the area; or (c) permission to gain access." *United States v.

Davis*, 967 F.2d 84, 87 (2d Cir. 1992).

"[E]ven if a third party lacks actual authority to consent to a search of a particular area,

[s]he still may have apparent authority to consent to the search." *Moore v. Andreno*, 505 F.3d

203, 209 (2d Cir. 2007) (citing *United States v. Buckner*, 473 F.3d 551, 555 (4th Cir. 2007)).

"The Supreme Court has explained that apparent authority to give consent 'must be judged

against an objective standard: would the facts available to the officer at the moment . . . warrant a

man of reasonable caution in the belief that the consenting party had authority over the

premises?'" *McGee*, 564 F.3d at 139.  Additionally, "[the] apparent authority rule applies only

to mistakes of fact and not mistakes of law."  *Moore*, 505 F.3d at 209 (alterations adopted)

(quotation marks omitted) (citing, inter alia, *United States v. Brown*, 961 F.2d 1039, 1041 (2d

Cir. 1992) (per curiam) ("*Rodriguez*[, 497 U.S. at 177,] would not validate, however, a search

premised upon an erroneous view of the law.  For example, an investigator's erroneous belief

that landladies are generally authorized to consent to a search of a tenant's premises could not

provide the authorization necessary for a warrantless search." (citation omitted))).

       Defendants argue that Plaintiff's Amended Complaint still demonstrates that Janet had

apparent authority to consent to the search of the Residence.  (*See* Schulhoff Mem. 13–14; Hyde

Park Defs' Mem 11–12.)  The Court agrees.

       As alleged, Janet called the police to report "that she was the executor of the estate with

legal ownership of the property, that Plaintiff was in the Residence without authorization and

that Plaintiff was criminally removing property from the Residence that did not belong to him."

(Am. Compl. ¶ 29.)  Indeed, in his Opposition, Plaintiff alleges that Janet reported to the police

that:

> Plaintiff and his wife had no rights to be in the Residence and [] that they were
> engaged in "suspicious activity," specifically, that they were removing items from
> the Residence when they had been expressly told to not remove items without
> [Janet] being present[, and] that she was the appointed executor of the [e]state
> which owned the Residence.

(Pl's Hyde Park Opp'n 6.)  These allegations are substantially the same as those raised in

Plaintiff's initial submissions, (*see* March 2023 Op. 26), and would "warrant a [person] of

reasonable caution in the belief that the consenting party had authority over the premises,"

*McGee*, 564 F.3d at 139.  Thus, for substantially the same reasons set forth in the March 2023

Opinion, the Court concludes that a reasonable person in the position of each of the Officer

Defendants would have concluded he had consent from a party with the requisite authority over

34

the Residence to search it for evidence of the alleged crimes being committed therein.  (*See id.* at 26–27.)  *See also United States v. Thomas*, No. 14-CR-31, 2015 WL 164075, at *6–7 (D. Conn. Jan. 13, 2015) (holding that alleged victim of sex trafficking, who was a minor, had apparent authority to consent to search of hotel room she had access to and stayed in, even though victim was not listed as guest by the hotel), *aff'd sub nom. United States v. Walters*, 678 F. App'x 44 (2d Cir. 2017); *Turner*, 23 F. Supp. 3d at 305 (finding alleged victim of domestic violence had apparent authority to consent to search of suspect's apartment where she had informed law enforcement she had lived with the suspect at the apartment for a substantial period over the previous three months and had returned her keys immediately prior to making a report).[27]

Insofar as Plaintiff raises any arguments to the contrary, he seems to suggest that the Officer Defendants should not have believed Janet or should have conducted a more thorough investigation into the ownership of the Residence upon their arrival.  (*See, e.g.*, Pl's Schulhoff Opp'n 16–17; Pl's Hyde Park Opp'n 16–17.)  However, as this Court has previously explained, the law is clear that law enforcement officials are entitled to presume the truthfulness of the reports of crime victims when determining whether they have probable cause to arrest.  *See Alexander v. City of Syracuse*, 573 F. Supp. 3d 711, 729 (N.D.N.Y. 2021) ("[C]ourts assume '[t]he veracity of citizen complaints [by] the victims of the very crime they report to the police . . . .'" (second and third alterations in original) (quoting *Miloslavsky v. AES Eng'g Soc., Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992)); *Torres v. City of New York*, No. 16-CV-6719, 2017 WL 4325822, at *3 (E.D.N.Y. Sept. 27, 2017) ("It is well-settled that even where the information on which a police officer relies later turns out to be mistaken, probable cause still exists as long as

---

[27] In light of this holding, the Court need not, and will not, re-address the difficult question of whether Janet had actual authority over the Residence.  (*See* March 2023 Op. 25–26.)

the arresting officer acted reasonably in relying on that information." (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).  "While these holdings do not directly apply in the context of determining whether officers could reasonably rely upon a third party's consent to a search, the Court finds them relevant, given the somewhat unique facts of this case."  (March 2023 Op. 27 n.13.)

Accordingly, the Court again dismisses Plaintiff's Fourth Amendment claim regarding the warrantless search of the Residence.

### b.  Search of Plaintiff's Vehicle

Plaintiff also reargues that that the Officer Defendants violated his Fourth Amendment rights when they searched his van without a warrant.  (*See* Am. Compl. 8–9; Pl's Schulhoff Opp'n 13–19; Pl's Hyde Park Opp'n 13–19.)[28]

Under the automobile exception to the warrant requirement, "officers 'may conduct a warrantless search of a movable vehicle when they have probable cause to believe it contains contraband or evidence of a crime.'"  *Martinez v. City of New York*, 564 F. Supp. 3d 88, 99 (E.D.N.Y. 2021) (quoting *United States v. Vassiliou*, 820 F.2d 28, 30 (2d Cir. 1987)); *see also Florida v. Harris*, 568 U.S. 237, 243 (2013) (holding that a police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present).  "The Supreme Court has justified the automobile exception under two rationales: first, 'a person's expectation of privacy in a vehicle is less than his or her expectation of privacy in a home'; and second, 'because a vehicle is readily movable, exigent circumstances might require a warrantless search.'"  *United States v.*

---

[28] Although Schulhoff suggests that Plaintiff may also be asserting a claim under the Fourth Amendment for the search of his *wife's* car, (*see* Schulhoff Mem. 14–16), the Court will not construe the Amended Complaint to raise such a claim, which would implicate standing issues that the Parties have not mentioned, let alone raised for the Court's consideration.

*Samms*, No. 22-CR-130, 2023 WL 386819, at *9 (D. Conn. Jan. 25, 2023) (quoting *United States v. Howard*, 489 F.3d 484, 492 (2d Cir. 2007)).

Probable cause exists "if [an officer], on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022) (per curiam) (citations omitted). Probable cause is satisfied by "the kind of fair probability on which reasonable and prudent people . . . act." *Id.* at 858 (quotation marks omitted) (quoting *Harris*, 568 U.S. at 244). "To establish probable cause, officers may rely on hearsay." *Martinez*, 564 F. Supp. 3d at 99 (citing *United States v. Premises & Real Prop. at 4492 S. Livonia Rd.*, 889 F.2d 1258, 1267 (2d Cir. 1989)). Moreover, law enforcement officials are entitled to rely on the veracity of complaints they receive from victims or eyewitnesses. *See Mittelman v. County of Rockland*, No. 07-CV-6382, 2013 WL 1248623, at *11 (S.D.N.Y. Mar. 26, 2013) (granting summary judgment on a Fourth Amendment claim because "[a]s a matter of law, it was reasonable for the police to rely on [the] veracity [of information provided to the police] in making their decision to search [the] [p]laintiffs' home" (citing *Bernard*, 25 F.3d at 102)).

As the Court previously found, the Officer Defendants clearly had probable cause to search Plaintiff's van. (*See* March 2023 Op. 28–29.) As alleged, Janet informed law enforcement officials that "Plaintiff was criminally removing property from the Residence that did not belong to him," and that "she had witnessed through a remote security camera a burglary at the Residence because she claimed to have seen Plaintiff taking various items out of the Residence without her permission." (Am. Compl. ¶ 29.) Those allegations alone are sufficient to demonstrate that the Officer Defendants had probable cause to search Plaintiff's van, because

a reasonable inference therefrom was that Plaintiff may have been moving the purportedly stolen property into his van.  *See Micalizzi v. Ciamarra*, 206 F. Supp. 2d 564, 578 (S.D.N.Y. 2002) (holding that the automobile exception applied where detective who searched automobile was relying on report from fellow officer that a naked man who had allegedly been exposing himself to children in the area had been sitting in the car).

Throughout his Amended Complaint and Oppositions, Plaintiff is *adamant* that the Officer Defendants could not possibly have had probable cause given the facts on the ground— namely, that he and his wife were not, in fact, stealing anything from their own home and that Janet fabricated the burglary accusation.  (*See generally* Am. Compl.; Pl's Schulhoff Opp'n; Pl's Hyde Park Opp'n.)  However, it bears restating what the Court previously noted, (*see* March 2023 Op. 29):  "It is well-settled that even where the information on which a police officer relies later turns out to be mistaken, probable cause still exists as long as the . . . officer acted reasonably in relying on that information."  *Torres*, 2017 WL 4325822, at *3 (citing *Bernard*, 25 F.3d at 102); *see also Mittelman*, 2013 WL 1248623, at *11 (concluding that the police were entitled to rely on reports of witnesses in determining whether to search the plaintiff's home, even though those reports were later determined to be erroneous); *cf. Panetta v. Crowley*, 460 F.3d 388, 395–96 (2d Cir. 2006) (explaining that "'[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause,' and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause" (alterations in original) (citation omitted)); *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 135 (E.D.N.Y. 1998) (explaining that "[o]nce a police officer has probable cause, he need not explore 'every theoretically plausible claim of innocence before making an arrest[;]' . . . [officers] have no duty to investigate an exculpatory statement of the accused, and their refusal to do so does not

38

defeat probable cause" (citations omitted) (quoting, inter alia, *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 129 (2d Cir. 1997)).[29]

In sum, the Court again dismisses Plaintiff's Fourth Amendment claim regarding the warrantless search of the Residence.

### c. Temporary Detention of Plaintiff

In the Amended Complaint, Plaintiff raises the new allegation that the Officer Defendants violated his Fourth Amendment rights in that they "seized [him] and restricted his liberty[] when he was peacefully occupying his own home" on February 13, 2020.  (Am. Compl. 9.)  In light of Plaintiff's allegation, which are accepted as true at this stage of the litigation, the Court construes Plaintiff's claim to be that the Officer Defendants unlawfully detained him during their search of the Residence.  (*See* Pl's Schulhoff Opp'n 7 (alleging that Schulhoff, "with the cooperation of the other [Officer Defendants], ordered Plaintiff and his wife to stay in the living room" after

---

[29] Moreover, Plaintiff's reliance on *Triolo v. Nassau County*, 24 F.4th 98 (2d Cir. 2022) is misplaced.  (Pl's Schulhoff Opp'n 17; Pl's Hyde Park Opp'n 17.)  In *Triolo*, the Second Circuit affirmed the district court's conclusion that a jury had properly found an absence of probable cause under the circumstances of that case.  *Triolo*, 24 F.4th at 107.  There, purported assault victims "signed sworn statements attesting to [an] alleged assault," but the alleged victims "had [no] visible injuries after allegedly being grabbed, choked, or punched," there was a relevant domestic incident report, which indicated that "no offence was committed," and a law enforcement officer ignored photographic evidence that undermined the assault allegations.  *Id.* at 106–07 (alteration adopted).  Thus, the Second Circuit stated that the officer "was not free to disregard the plainly exculpatory evidence that was presented to him."  *Id.* at 107.  Here, by contrast, Plaintiff does not point to such resoundingly clear exculpatory evidence; instead, he merely points to Janet's lack of specific knowledge regarding the allegedly stolen items—which is not entirely surprising given that she was in Florida—the fact that he and his wife were handling groceries and appeared to be doing laundry, and Janet's mistaken (or false) allegation regarding Plaintiff removing items from the shed.  (Pl's Schulhoff Opp'n 6–7, 18–19; Pl's Hyde Park Opp'n 6–7, 18–19.)  These facts were insufficient to negate probable cause.  *See Panetta*, 460 F.3d at 395–96 ("The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause . . . ." (quotation marks, citation, and alteration omitted)); *see also Mittelman*, 2013 WL 1248623, at *11 (concluding that it was reasonable for police to rely on witness reports that later turned out to be false).

they arrived at the Residence).)  As noted, the Hyde Park Defendants have not moved to dismiss

this claim, so the focus of the Court's analysis in this sub-section will be Schulhoff.

Although Schulhoff fails to make this argument, the Court notes at the outset that "[a]n

officer's authority to detain incident to a search is categorical; it does not depend on the

'quantum of proof justifying detention . . . .'"  *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting

*Michigan v. Summers*, 452 U.S. 692, 705 n.19 (1981)).  The Supreme Court has explained that,

in a detention incident to a lawful search of a house, "the detention of an occupant is surely less

intrusive than the search itself," and that this "incremental intrusion" is outweighed by

"legitimate law enforcement interests that provide substantial justification for detaining an

occupant," such as "preventing flight in the event that incriminating evidence is found;

minimizing the risk of harm to the officers; and facilitating the orderly completion of the search."

*Id.* (quotation marks omitted) (quoting *Summers*, 452 U.S. at 701–03).  Accordingly, courts have

consistently held that law enforcement officers may temporarily detain individuals incident to

otherwise lawful searches without violating the Fourth Amendment.  *See B. v. City of New York*,

No. 14-CV-1021, 2016 WL 4530455, at *9 (E.D.N.Y. Aug. 29, 2016) ("Officers may . . . 'detain

the occupants of the premises while a proper search is conducted[.]'" (quoting *Summers*,

452 U.S. at 705)); *see also United States v. Whitlock*, No. 20-CR-17, 2021 WL 1439846, at *7

(D. Vt. Apr. 16, 2021) (concluding that a criminal defendant could "be lawfully detained during

the search [of a car]" where "[t]he smell of marijuana established probable cause for federal law

enforcement's search of the [car] under the automobile exception [to the Fourth Amendment

warrant requirement]"); *Foster v. McCabe*, No. 19-CV-843, 2020 WL 2840060, at *6–8

(W.D.N.Y. June 1, 2020) (relying on *Muehler* and *Summers* and concluding that, because the

defendants were "entitled to qualified immunity as to the search, they are also entitled to

qualified immunity . . . as to the detentions during the search" where the defendants searched a plaintiff-parolee's residence without a warrant for four hours "during which time both [p]laintiffs were required to sit at a table, and [one plaintiff] was handcuffed"); *Crismale v. Reilly*, No. 13-CV-470, 2014 WL 3738151, at *1 (D. Conn. July 29, 2014) (concluding that the plaintiff's temporary detention was reasonable under the Fourth Amendment where the plaintiff was "detained outside in his boat yard for over an hour" by the defendant-officer "who was investigating a complaint that [the] plaintiff had illegally harvested shellfish"); *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 612 (S.D.N.Y. 2013) (explaining that "any detention incident to the lawful search of [the plaintiff's] vehicle [could not] give rise to a Fourth Amendment violation"); *United States v. Obbanya*, No. 11-CR-677, 2012 WL 851129, at *5 (N.D. Cal. Mar. 13, 2012) (determining that law enforcement officers had the authority to detain the criminal defendant incident to a protective sweep of a house "where the officers had reason to believe that there was someone inside the house in immediate need of assistance, possibly due to [the d]efendant's acts").

Applying the foregoing principles here, Plaintiff's temporary detention at the Residence, as alleged, was plainly appropriate.  In other words, because the Officers Defendants were conducting a lawful search of the Residence pursuant to Janet's apparent authority, *see supra* Section II.B.3.a, their investigative detention of Plaintiff during that search was reasonable under the Fourth Amendment.  *See United States v. Williams*, No. 12-CR-6152, 2015 WL 429087, at *18 (W.D.N.Y. Feb. 2, 2015) (concluding—where law enforcement officers conducted a warrantless search of an apartment—that the temporary detention of a criminal defendant was permissible "during the sweep of the apartment and pending [an] immediate further

investigation" and collecting cases), *report and recommendation adopted*, 2015 WL 3454430 (W.D.N.Y. May 29, 2015).

In his Motion, Schulhoff argues that Plaintiff did not plausibly allege that he was "seized" within the meaning of the Fourth Amendment and that, even if he did, such a seizure was founded on reasonable suspicion. (Schulhoff Mem. 16–17.) "A Fourth Amendment 'seizure' occurs when police detain an individual under circumstances in which a reasonable person would believe he or she is not 'free to leave.'" *Rivera v. Town of New Fairfield*, No. 22-CV-1874, 2023 WL 6611062, at *4 (S.D.N.Y. Oct. 10, 2023) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "Beginning with *Terry v. Ohio*, 392 U.S. 1 [(1968)], the [Supreme] Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004). "To ensure that the resulting seizure is constitutionally reasonable, a *Terry* stop must be limited. The officer's action must be justified at its inception, and . . . reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quotation marks omitted). "For example, the seizure cannot continue for an excessive period of time, or resemble a traditional arrest." *Id.* at 185–86 (citations omitted); *see also Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." (quotation marks omitted)). "In assessing whether a detention is too long in duration to be justified as an investigative stop, . . . it [is] appropriate to examine whether the police diligently

pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspect]." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

With regard to reasonable suspicion, "[t]he reasonable suspicion standard is 'not high' and is 'less demanding than probable cause, requiring only facts sufficient to give rise to a reasonable suspicion that criminal activity *may* be afoot.'" *United States v. Santillan*, 902 F.3d 49, 56 (2d Cir. 2018) (emphasis in original) (quoting *United States v. Singletary*, 798 F.3d 55, 60 (2d Cir. 2015)). Notably, "[c]onduct that is as consistent with innocence as with guilt may provide the basis for reasonable suspicion where there is some indication of possible illicit activity." *Id.* (citing *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008)). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). To establish reasonable suspicion, an officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27); *see also Alabama v. White*, 496 U.S. 325, 329 (1990) (same). "Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant." *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

"In assessing the reasonableness of an officer's suspicion, [courts] must take into account the totality of the circumstances and must evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (quotation marks omitted). "[T]he

proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing." *United States v. Lee*, 916 F.2d 814, 820 (2d Cir. 1990).

Notwithstanding Schulhoff's conclusory and unsupported argument to the contrary, (*see* Schulhoff Mem. 16), the Court has little trouble concluding that Plaintiff did not feel free to leave the Residence when four police officers and a state trooper arrived at the Residence to investigate allegations that a burglary was underway, and proceeded to enter the Residence without invitation. (*See* Am. Compl. ¶¶ 32–34.) *See Brown v. Oneonta County*, 221 F.3d 329, 340 (2d Cir. 2000) (explaining that "[p]ertinent factors identifying a police seizure can include," among other things, "the threatening presence of several officers" (citation omitted)). Thus, Plaintiff has plausibly alleged that he was seized for Fourth Amendment purposes on February 13, 2020.

However, for substantially the same reasons set forth above with respect to the Officer Defendants having probable cause to search Plaintiff's van, *see supra* Section II.B.3.b, Schulhoff had the reasonable suspicion required to temporarily detain Plaintiff in the Residence's living room, *see Wardlow*, 528 U.S. at 123 (explaining that "'reasonable suspicion' is a less demanding standard than probable cause"). Again, Schulhoff arrived at the Residence in response to Janet's reports that "Plaintiff was criminally removing property from the Residence that did not belong to him." (Am. Compl. ¶ 29.) Upon arriving at the Residence to investigate "suspicious activity," Schulhoff encountered Plaintiff. (*Id.* ¶¶ 31, 33–34.) In light of these facts, it was certainly reasonable for Schulhoff to suspect "criminal activity *may* be afoot." *Santillan*, 902 F.3d at 56 (emphasis in original) (citation omitted). And to the degree Plaintiff continues to assert that Schulhoff should have taken his claims of innocence more seriously, "[a] determination that

reasonable suspicion exists[] . . . need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 270 (2002) (citing *Wardlow*, 528 U.S. at 125).

To be sure, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Brush v. Old Navy LLC*, — F. Supp. 3d —, 2023 WL 5311434, at *20 (D. Vt. Aug. 17, 2023) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Plaintiff's submissions, however, provide no basis from which to conclude that his detention lasted too long. Indeed, he offers no allegations *at all* as to the amount of time between when the Officer Defendants arrived at the Residence, and when they made him leave.

The Court thus dismisses Plaintiff's Fourth Amendment claim relating to his detention at the Residence. Such dismissal pertains to the claim against Schulhoff only, as the Hyde Park Defendants have not moved to dismiss this claim.[30]

### 4. *Monell* Liability

The Hyde Park Defendants argue that Plaintiff has failed to adequately allege the existence of any official policy or custom that could provide the basis for imposing municipal liability against Hyde Park pursuant to *Monell* and its progeny. (*See* Hyde Park Defs' Mem. 15–16; Hyde Park Defs' Reply 7–8.)

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes*, 723 F.3d at 405–06. However, "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of

---

[30] In light of the holdings herein, the Court need not consider Defendants' claims of qualified immunity.

law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that

an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*,

542 F.3d 31, 36 (2d Cir. 2008).

This multi-factor test, and particularly its fifth element, reflects the notion that "a

municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of

Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of

New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and

explained by the Supreme Court, municipalities may only be held liable when the municipality

itself deprives an individual of a constitutional right."). In other words, a municipality may not

be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City

of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also Vassallo v. Lando*, 591

F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable

where the entity itself commits a wrong"). Instead, there must be a "direct causal link between a

municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*,

489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988)

("[G]overnments should be held responsible when, and only when, their official policies cause

their employees to violate another person's constitutional rights.").

"In determining municipal liability, it is necessary to conduct a separate inquiry into

whether there exists a 'policy' or 'custom.'" *Davis v. City of New York*, 228 F. Supp. 2d 327,

336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy

cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee

of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *see also City of Oklahoma City v. Tuttle*,

471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional

46

activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes

proof that it was caused by an existing, unconstitutional municipal policy, which policy can be

attributed to a municipal policymaker."); *Santana v. City of New York*, No. 15-CV-6715, 2018

WL 1633563, at *10 (S.D.N.Y. Mar. 29, 2018) ("[A] 'single incident alleged in a complaint,

especially if it involved only actors below the policy-making level, does not suffice to show a

municipal policy.'" (quoting *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998))); *Brogdon v. City*

*of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is

generally insufficient to establish the affirmative link between the municipal policy or custom

and the alleged unconstitutional violation.").

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the

following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by
> government officials responsible for establishing the municipal policies that caused
> the particular deprivation in question; (3) a practice so consistent and widespread
> that, although not expressly authorized, constitutes a custom or usage of which a
> supervising policy-maker must have been aware; or (4) a failure by policymakers
> to provide adequate training or supervision to subordinates to such an extent that it
> amounts to deliberate indifference to the rights of those who come into contact with
> the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted);

*accord Atadzhanov v. City of New York*, No. 21-CV-5098, 2022 WL 4331304, at *11 (S.D.N.Y.

Sept. 19, 2022).  Moreover, as noted, a plaintiff must also establish a causal link between the

municipality's policy, custom, or practice and the alleged constitutional injury.  *See Tuttle*, 471

U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly

sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind

a constitutional violation.  There must at least be an affirmative link between[, for example,] the

training inadequacies alleged, and the particular constitutional violation at issue." (emphasis

omitted)); *Roe*, 542 F.3d at 37 (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury" (quoting *Brown*, 520 U.S. at 404)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiff['s] injury, *Monell* prohibits a finding of liability against the [c]ity."); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (quotation marks omitted)).

Here, Plaintiff's alleges that Hyde Park "promoted the unlawful behavior of the police officers through official policies," (Am. Compl. ¶ 72), and that it "promoted the unlawful behavior of the police officers through official policies that required officers to defer to decisions of a State law enforcement officer even as such decisions constituted violations of civil rights," (*id.* ¶ 80). In his Opposition to Hyde Park's Motion, Plaintiff supplements his *Monell* allegations as follows:

> Based on the concerted action by all of the [Officer Defendants], Plaintiff concludes that . . . Hyde Park has given [its] officers overly broad discretion when they encounter disputes regarding whether a non-owner resident has a lawful right to occupy a home. [Hyde Park] has also given its officers overly broad discretion to resolve disputes over specific ownership of chattel. As far as Plaintiff can tell, the [Officer Defendants] had broad discretion to resolve these disputes without regard to legal procedural requirements or the respective rights of the parties. Moreover, as far as Plaintiff can tell, the [Hyde Park] lacks procedures requiring officers to provide written notices to persons being evicted who dispute the validity of their eviction or are deprived of their chattel.

(Pl's Hyde Park Opp'n 11.)

Plaintiff is unclear as to which theory of municipal liability he is invoking. Nevertheless—construing his pleadings liberally with "special solicitude" and interpreting them

to raise the strongest claims that they suggest, *see Oquendo v. Quality Choice Corr. Healthcare*, No. 16-CV-1828, 2017 WL 3927293, at *3 (S.D.N.Y. Sept. 6, 2017) (citation omitted)—the Court will analyze whether Plaintiff has plausibly alleged *any* such theory, *see Atadzhanov*, 2022 WL 4331304, at *11 (listing the modes of proving a policy, custom, or practice under *Monell*).

<u>a.  Formal Policy</u>

The Court first considers whether Plaintiff plausibly alleged the existence of a formal policy officially endorsed by Hyde Park.  *See id.*  As noted, Plaintiff does assert that Hyde Park "promoted the unlawful behavior of [its] police officers through *official policies* that required officers to defer to decisions of a State law enforcement officer even as such decisions constituted violations of civil rights."  (Am. Comp. ¶ 80 (emphasis added); *see also id.* ¶ 72.) "[U]nder *Monell*, the terms 'official policy' and 'formal policy' are different and not interchangeable."  *Clarke v. Antonini*, No. 21-CV-1877, 2022 WL 4387357, at *6 n.1 (S.D.N.Y. Sept. 22, 2022) (citing *Monell*, 436 U.S. at 690–91 (explaining that municipalities can be sued under § 1983 for an allegedly unconstitutional formal "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the municipalities' officers, as well as for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision[-]making channels")).  In other words, an official policy is not necessarily a *formal* policy for *Monell* purposes.  Moreover, the Court highlights that Plaintiff at no point states that Hyde Park has a formal policy—be it a "policy statement, ordinance, regulation, or decision officially adopted and promulgated," *Monell*, 436 U.S. at 690—that is applicable to the constitutional violations he alleges in this case, (*see generally* Am. Compl.; Pl's Hyde Park Opp'n).  Given the lack of factual support for his conclusory allegations, the Court cannot "infer more than the mere possibility" that there exists a formal policy in Hyde Park relevant to Plaintiff's *Monell* claim.

*See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).  Indeed, the Court must disregard

such threadbare, conclusory allegations.  *See Lowery v. City of New York*, No. 10-CV-7284, 2014

WL 2567104, at *6 (S.D.N.Y. June 6, 2014) (dismissing a pro se plaintiff's *Monell* claim for

failing to allege either an underlying constitutional violation or sufficient facts beyond

"boilerplate, conclusory allegations"); *Simms v. City of New York*, No. 10-CV-3420, 2011 WL

4543051, at *3 (E.D.N.Y. Sept. 28, 2011) (dismissing conclusory allegations that did not provide

sufficient facts to allow the court to infer what city policies or practices led to the alleged

training deficiency); *Moore v. City of New York*, No. 08-CV-8879, 2010 WL 742981, at *6

(S.D.N.Y. Mar. 2, 2010) ("Allegations that a defendant acted pursuant to a policy or custom

without any facts suggesting the policy's existence, are plainly insufficient." (quotation marks

omitted)).  Thus, Plaintiff cannot rely on the existence of a formal Hyde Park policy to survive

this aspect of the Hyde Park Defendants' Motion.[31]

---

[31] Plaintiff does assert that Hyde Park "lacks procedures requiring officers to provide written notices to persons being evicted who dispute the validity of their eviction or are deprived of their chattel."  (Pl's Hyde Park Opp'n 11.)  However, an alleged absence of a formal policy "is not a policy and is not actionable under *Monell*."  *Zachary v. City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014) (citing *Monell*, 436 U.S. at 690–91); *see also Quinones v. New York City*, No. 19-CV-5400, 2020 WL 5665142, at *19 (S.D.N.Y. Aug. 17, 2020) ("[B]ut, under *Monell*, a municipality's failure to put a formal policy in place to prevent unlawful conduct is not the same thing as an actionable policy." (citation omitted)), *report and recommendation adopted*, No. 19-CV-5400, 2020 WL 6901340 (S.D.N.Y. Nov. 23, 2020).  "Nonetheless, the Supreme Court has left a narrow opening for § 1983 claims like the one [the Court] address[es] here seeking liability based not on affirmative conduct but on a government official's failure to act."  *Reynolds v. Giuliani*, 506 F.3d 183, 191–92 (2d Cir. 2007) (citing *City of Canton*, 489 U.S. at 394–95 (O'Connor, J., concurring in part and dissenting in part) ("Where . . . a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of background events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution.")).  When a municipality "does not have an adequate policy . . . *Monell* liability exists 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions."  *Fraser v. City of New York*, No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021) (quoting *Reynolds*, 506 F.3d at 192).  "Such a pattern,

b.  Final Policymaker

Next the Court considers whether Plaintiff plausibly alleged any "actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question." *See Atadzhanov*, 2022 WL 4331304, at *11.  "Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003).  "An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Id.*  "[E]ven a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (internal quotation marks and citation omitted).  When a non-decisionmaker committed the constitutional violation "a plaintiff must allege facts suggesting that an officer with final policymaking authority ordered, ratified, or 'was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'" *Hu v. City of New York*, 927 F.3d 81, 105 (2d Cir. 2019) (quoting *Amnesty Am.*, 361 F.3d at 126).  Here, Plaintiff has alleged *no* facts whatsoever suggesting that Torres, Ferrara, Stallone, and Tucker were final decisionmakers for Hyde Park, or that any final policymaking authority for Hyde Park ordered, ratified, or was aware of their allegedly unconstitutional actions.  *See id.*  (*See generally* Am. Compl.; Pl's Hyde Park Opp'n.)  Thus, Plaintiff cannot rely on this theory of *Monell* liability. *See Guity v. Uniondale Union Free Sch. Dist.*, No. 18-CV-4369, 2019 WL 3402280, at *7–8

---

if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Id.*  As discussed *infra*, however, Plaintiff does not state a claim under this category of *Monell* liability.

(E.D.N.Y. July 26, 2019) (dismissing a pro se plaintiff's *Monell* claims where she only made the "conclusory allegation" that a defendant was a policymaker, and otherwise "allege[d] no facts that demonstrate that [that defendant] or any of the other defendants were final policymakers for any official municipal policy or custom").

### c. Widespread Practice

Turning to the "widespread practice" theory of *Monell* liability, *see Atadzhanov*, 2022 WL 4331304, at *11, to demonstrate a de facto policy or custom through a widespread practice, a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions," *Buari v. City of New York*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021) (quoting *Amnesty Am.*, 361 F.3d at 126). A practice can constitute a custom under *Monell* when the practice is "persistent and widespread," or "permanent and well settled as to constitute a 'custom or usage' with the force of law" and to "imply the constructive knowledge of policymaking officials." *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 400 (S.D.N.Y. 2021) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1992)); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (noting that to demonstrate a practice is sufficiently widespread and crystalized to constitute a custom under *Monell*, "a plaintiff must prove that the custom at issue is permanent and well-settled" (citing *Praprotnik*, 485 U.S. at 127)).

In the instant case, Plaintiff only points to the alleged constitutional deprivations that he suffered on February 13, 2020, and he entirely fails to identify any other incidents that would indicate a pattern or practice, which is insufficient to state a *Monell* claim. (*See generally* Am. Compl.; Pl's Hyde Park Opp'n.) *See McKeefry v. Town of Bedford*, No. 18-CV-10386, 2019 WL 6498312, at *4 (S.D.N.Y. Dec. 2, 2019) ("Plaintiff's opposition claims that the [complaint]

'clearly shows the pattern, practice or custom employed by [the d]efendants,' . . . but she provides facts only about her case, which is insufficient to show a pattern, practice, policy or custom."); *see also Barkai v. Nuendorf*, No. 21-CV-4060, 2023 WL 2691712, at *35 (S.D.N.Y. Mar. 29, 2023) (explaining that the pro se plaintiff had "not point[ed] to any instance of [the defendant-county] allegedly implementing th[e alleged] widespread practice beyond his own case" and that that "alone would be fatal to Plaintiff's *Monell* claim"); *Aragon v. New York*, No. 14-CV-9797, 2017 WL 2703562, at *6 (S.D.N.Y. June 22, 2017) (dismissing claims where the pro se "[p]laintiff seem[ed] to allege the existence of a practice adopted by the [municipal defendant] solely based on [the p]laintiff's alleged experience"); *Gordon v. City of New York*, No. 10-CV-5148, 2012 WL 1068023, at *4 (E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where the pro se plaintiff's "allegation [was] unsupported by anything other than the facts of what occurred in his particular case" (citations omitted)); *cf. D'Alessandro v. City of New York*, 713 F. App'x 1, 10 (2d Cir. 2017) (summary order) (finding that the plaintiff "[did] not sufficiently allege a pattern of similar constitutional violations by the [defendant]" because he "never mention[ed] specific instances of prosecutorial misconduct beyond [his] own case"). Moreover, to the degree that the Officer Defendants' actions on February 13, 2020, led to a violation of Plaintiff's constitutional rights, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by [] mere employee[s] of the municipality." *Sagaria v. Orange Cnty. Jail*, No. 20-CV-2287, 2021 WL 4392422, at *8 n.11 (S.D.N.Y. Sept. 24, 2021); *accord Boykins v. Lopez*, No. 21-CV-2831, 2022 WL 2307684, at *7 (S.D.N.Y. June 27, 2022) ("Plaintiff's claim is based on a *single* incident of [the defendants'] failure to follow protocol, which generally is insufficient to establish a *Monell* claim." (emphasis in original) (citation omitted)); *see also Fernandez v. N.Y.C. Dep't of Corr.*, No. 08-CV-4294, 2010 WL 1222017, at

*6 (S.D.N.Y. Mar. 29, 2010) ("[The] [p]laintiff appears to allege a single, isolated episode of misconduct by correction officers . . . in failing to adequately provide for his safety and medical needs.  Thus, [the] [p]laintiff's claim for municipal liability must be dismissed."); *cf. Brogdon*, 200 F. Supp. 2d at 427 ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").  Thus, insofar as he relies on a "widespread practice" theory of *Monell* liability, such reliance is unavailing.  *See Pettiford v. City of Yonkers*, No. 14-CV-6271, 2021 WL 2556172, at *12 (S.D.N.Y. June 21, 2021) ("Pleadings articulating only isolated instances of unconstitutional behavior do not plausibly allege a well-settled custom.").

### d.  Failure to Train or Supervise

Finally, the Court considers whether Plaintiff plausibly alleged "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees."  *See Atadzhanov*, 2022 WL 4331304, at *11 (quotation marks omitted). A failure to train constitutes a policy or custom that is actionable under § 1983 only where "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need."  *City of Canton*, 489 U.S. at 390.  The Second Circuit has held that a finding of deliberate indifference requires: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights."  *Okin v. Vill.*

*of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (alteration in original) (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

Similarly, "[t]o establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Lopes v. Westchester County*, No. 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020).  Alternatively, "a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality consistently failed to discipline those involved." *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *21 (S.D.N.Y. Mar. 26, 2015) (emphasis omitted).  To establish deliberate indifference for a failure to supervise and/or discipline claim, the plaintiff must show that "the need for more or better supervision to protect against constitutional violations was obvious," which may be established "through proof of repeated complaints of civil rights violations . . . if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Buari*, 530 F. Supp. 3d at 400 (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)).

As to training, Plaintiff's claim fails because he has not alleged any specific training deficiency. *See Taranto v. Putnam County*, No. 21-CV-2455, 2023 WL 6318280, at *19 (S.D.N.Y. Sept. 28, 2023) (dismissing the plaintiff's *Monell* claim because, insofar as it sounded in a failure-to-train theory, "they ha[d] not alleged a specific training deficiency"); *see also Tieman*, 2015 WL 1379652, at *22 ("[A] plaintiff must plausibly allege a *specific* deficiency in

the municipality's training." (emphasis added)).  Moreover, to the extent Plaintiff's *Monell* claim

is based on a failure to supervise, the Court again points out that Plaintiff has *not* alleged that

there was a "pattern of allegations of or complaints about, or a pattern of actual, similar

unconstitutional activity."  *Lopes*, 2020 WL 1445729, at *5; *see also Tieman*, 2015 WL

1379652, at *21 (similar); *see also supra* Section II.B.4.c (explaining that, beyond the allegations

relating to his own experience on February 13, 2020, Plaintiff has not identified any other

incidents that would indicate a pattern of similar unconstitutional activity).

     Accordingly, the Court dismisses Plaintiff's *Monell* claim because, as set forth above, it

fails for multiple, independent reasons.  *See Jackson v. Westchester County*, No. 18-CV-7207,

2019 WL 3338020, at *4 (S.D.N.Y. July 25, 2019) (dismissing a *Monell* claim where the

plaintiff failed to "allege the existence of any policy, any actions taken or decisions made by any

. . . policymaking officials, any systemic failures to train or supervise, or any practices so

widespread that they practically have the force of law" and failed to "provide any factual details

regarding . . . other [purported] lawsuits and grievances" on similar issues, and collecting cases).

     5.  State Claims

     As noted, Plaintiff raises a number of claims under New York state law, including

unlawful detainer, unlawful eviction, conversion, false arrest, unlawful seizure of Plaintiff's

person and property, negligence, and intentional and negligent infliction of emotional distress.

(Am. Compl. 9–10; Pl's Schulhoff Opp'n 22–24; Pl's Hyde Park Opp'n 22–24.)

     The Court has "supplemental jurisdiction over all other claims that are so related to

claims in the action within such original jurisdiction that they form part of the same case or

controversy under Article III of the United States Constitution."  *See* 28 U.S.C. § 1367(a).

Because certain federal claims survive the instant Motions,  the Court may decide to exercise

supplemental jurisdiction over the state law claims against Defendants, provided they "derive

from a common nucleus of operative fact[s]." *Masciotta v. Clarkstown Cent. Sch. Dist.*, 136 F. Supp. 3d 527, 547 (S.D.N.Y. 2015) (alteration in original) (citation omitted); *accord Kaplan v. County of Orange*, 528 F. Supp. 3d 141, 171 (S.D.N.Y. 2021).  Here, Plaintiff's federal- and state-law claims all arise out of a common nucleus of operative facts—namely, the alleged events at the Residence involving the Officer Defendants on February 13, 2020.  The Court will therefore exercise jurisdiction over Plaintiff's state law claims.

Beyond Defendants' principal (and now-fruitless) argument that, to the extent Plaintiff's federal-law claims are all dismissed, the Court should decline to exercise supplemental jurisdiction over Plaintiff's state-law claims, (*see* Schulhoff Mem. 24; Hyde Park Defs' Mem. 16), Schulhoff independently contends that he is immune from Plaintiff's state claims, (Schulhoff Mem. 23–24; Schulhoff Reply 15).  More specifically, Schulhoff asserts that "the [New York] common law doctrine of governmental immunity shields [him] from liability for discretionary actions taken during the performance of governmental functions."  (Schulhoff Mem. 23.)

The doctrine of governmental immunity under New York law is "an affirmative defense on which [Schulhoff] bears the burden of proof."  *Villar v. Howard*, 64 N.E.3d 280, 283 (N.Y. 2016).  Further, the New York Court of Appeals has made clear that "resolution of [a] defendant's argument that he is entitled to governmental immunity . . . is not appropriate at th[e] pleading] stage of the proceedings."  *Id.*; *accord Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 401 (S.D.N.Y. 2020).  With that in mind—and noting Schulhoff's rather meager briefing of this issue, *see Piotrowski v. Rocky Point Union Free Sch. Dist.*, No. 18-CV-6262, 2023 WL 2710341, at *13 (E.D.N.Y. Mar. 30, 2023) (holding, where the party had only made passing references to its argument in its briefing, that the party's argument was "so

underdeveloped that the Court deem[ed] it waived" (citation omitted))—the Court declines to hold, as a matter of law, that Schulhoff is immune from suit under New York's common law doctrine of governmental immunity at this early stage of the case.

### III.  Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' Motions To Dismiss.  Specifically, the Court dismisses: (1) Plaintiff's Fourth Amendment claims relating to the Officer Defendants' searches of the Residence and Plaintiff's van; (2) Plaintiff's Fourth Amendment claim arising out of his temporary detention in the Residence *as against Schulhoff only*; and (3) Plaintiff's *Monell* claim against Hyde Park.  Thus, Plaintiff's Fourteenth Amendment due process claims relating to his removal from the Residence and his depravation of his personal property, along with Plaintiff's state-law claims, survive Defendants' Motions. Further, Plaintiff's Fourth Amendment claim arising out of his temporary detention in the Residence remains alive as against the Hyde Park Defendants.

Because this is the second adjudication of Plaintiff's claims on the merits, the claims dismissed herein—except for Plaintiff's Fourth Amendment claim relating to his temporary detention in the Residence as against Schulhoff—are dismissed *with prejudice*.  *See Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *see also Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss with prejudice where "[the p]laintiff has already had two bites at the apple, and they have proven fruitless" (alteration adopted and quotation marks omitted)); *see also Chavez*, 2022 WL 1487781, at *7 (same). However, with respect to Plaintiff's Fourth Amendment claim relating to his temporary detention in the Residence as against Schulhoff, in light of Plaintiff's pro se status and because this is the first adjudication of that claim on the merits, that claim is dismissed *without prejudice*.  If

Plaintiff wishes to file a second amended complaint, alleging additional facts and otherwise addressing the deficiencies identified above regarding his Fourth Amendment claim relating to his temporary detention in the Residence, Plaintiff must do so within 30 days of the date of this Order. There will be *no extensions*. The second amended complaint will replace, not supplement, the original and first amended complaint. The second amended complaint must therefore contain all of the claims, defendants, and factual allegations that Plaintiff wishes the Court to consider. The failure to timely file a second amended complaint may result in the dismissal of that claim with prejudice.

The Clerk of Court is respectfully directed to terminate the pending Motions. (Dkt. Nos. 47, 49.)

The Court will hold a telephonic status conference for this case on May 7, 2024, at 11:00 a.m.

SO ORDERED.

Dated:   March 19, 2024
         White Plains, New York

_____
     KENNETH M. KARAS
   United States District Judge